## COLEGROVE ET AL. v. GREEN ET AL.

No. 804. Argued March 7, 8, 1946.—Decided June 10, 1946.

*Urban A. Lavery* argued the cause for appellants. With him on the brief was *Edwin Borchard.*

*William C. Wines,* Assistant Attorney General of Illinois, argued the cause for appellees. With him on the brief was *George F. Barrett,* Attorney General.

*Abraham W. Brussell* filed a brief for the Better Government Association, as *amicus curiae,* in support of appellants.

MR. JUSTICE FRANKFURTER announced the judgment of the Court and an opinion in which MR. JUSTICE REED and MR. JUSTICE BURTON concur.

This case is appropriately here, under § 266 of the Judicial Code, 28 U. S. C. § 380, on direct review of a judgment of the District Court of the Northern District of Illinois, composed of three judges, dismissing the complaint of the appellants. These are three qualified voters in Illinois districts which have much larger populations than other Illinois Congressional districts. They brought this suit against the Governor, the Secretary of State, and the Auditor of the State of Illinois, as members *ex officio* of the Illinois Primary Certifying Board, to restrain them, in effect, from taking proceedings for an election in November 1946, under the provisions of Illinois law governing Congressional districts. Illinois Laws of 1901, p. 3. Formally, the appellants asked for a decree, with its incidental relief, § 274 (d) Judicial Code, 28 U. S. C. § 400, declaring these provisions to be invalid because they violated various provisions of the United States Constitution and § 3 of the Reapportionment Act of August 8, 1911, 37 Stat. 13, as amended, 2 U. S. C. § 2a, in that by reason of subsequent changes in population the Congressional districts for the election of Representatives in the Congress created by the Illinois Laws of 1901 (Ill. Rev. Stat. Ch. 46 (1945) §§ 154–56) lacked compactness of terri-

tory and approximate equality of population. The District Court, feeling bound by this Court's opinion in *Wood* v. *Broom,* 287 U. S. 1, dismissed the complaint. 64 F. Supp. 632.

The District Court was clearly right in deeming itself bound by *Wood* v. *Broom, supra,* and we could also dispose of this case on the authority of *Wood* v. *Broom.* The legal merits of this controversy were settled in that case, inasmuch as it held that the Reapportionment Act of June 18, 1929, 46 Stat. 21, as amended, 2 U. S. C. § 2 (a), has no requirements "as to the compactness, contiguity and equality in population of districts." 287 U. S. at 8. The Act of 1929 still governs the districting for the election of Representatives. It must be remembered that not only was the legislative history of the matter fully considered in *Wood* v. *Broom,* but the question had been elaborately before the Court in *Smiley* v. *Holm,* 285 U. S. 355, *Koenig* v. *Flynn,* 285 U. S. 375, and *Carroll* v. *Becker,* 285 U. S. 380, argued a few months before *Wood* v. *Broom* was decided. Nothing has now been adduced to lead us to overrule what this Court found to be the requirements under the Act of 1929, the more so since seven Congressional elections have been held under the Act of 1929 as construed by this Court. No manifestation has been shown by Congress even to question the correctness of that which seemed compelling to this Court in enforcing the will of Congress in *Wood* v. *Broom.*

But we also agree with the four Justices (Brandeis, Stone, Roberts, and Cardozo, JJ.) who were of opinion that the bill in *Wood* v. *Broom, supra,* should be "dismissed for want of equity." To be sure, the present complaint, unlike the bill in *Wood* v. *Broom,* was brought under the Federal Declaratory Judgment Act which, not having been enacted until 1934, was not available at the time of *Wood* v. *Broom.* But that Act merely gave the federal courts competence to make a declaration of rights even though

no decree of enforcement be immediately asked. It merely permitted a freer movement of the federal courts within the recognized confines of the scope of equity. The Declaratory Judgment Act "only provided a new form of procedure for the adjudication of rights in conformity" with "established equitable principles." *Great Lakes Co.* v. *Huffman,* 319 U. S. 293, 300. And so, the test for determining whether a federal court has authority to make a declaration such as is here asked, is whether the controversy "would be justiciable in this Court if presented in a suit for injunction . . ." *Nashville, C. & St. L. R. Co.* v. *Wallace,* 288 U. S. 249, 262.

We are of opinion that the appellants ask of this Court what is beyond its competence to grant. This is one of those demands on judicial power which cannot be met by verbal fencing about "jurisdiction." It must be resolved by considerations on the basis of which this Court, from time to time, has refused to intervene in controversies. It has refused to do so because due regard for the effective working of our Government revealed this issue to be of a peculiarly political nature and therefore not meet for judicial determination.

This is not an action to recover for damage because of the discriminatory exclusion of a plaintiff from rights enjoyed by other citizens. The basis for the suit is not a private wrong, but a wrong suffered by Illinois as a polity. Compare *Nixon* v. *Herndon,* 273 U. S. 536 and *Lane* v. *Wilson,* 307 U. S. 268, with *Giles* v. *Harris,* 189 U. S. 475. In effect this is an appeal to the federal courts to reconstruct the electoral process of Illinois in order that it may be adequately represented in the councils of the Nation. Because the Illinois legislature has failed to revise its Congressional Representative districts in order to reflect great changes, during more than a generation, in the distribution of its population, we are asked to do this, as it were, for Illinois.

Of course no court can affirmatively re-map the Illinois districts so as to bring them more in conformity with the standards of fairness for a representative system.  At best we could only declare the existing electoral system invalid. The result would be to leave Illinois undistricted and to bring into operation, if the Illinois legislature chose not to act, the choice of members for the House of Representatives on a state-wide ticket.  The last stage may be worse than the first.  The upshot of judicial action may defeat the vital political principle which led Congress, more than a hundred years ago, to require districting.  This requirement, in the language of Chancellor Kent, "was recommended by the wisdom and justice of giving, as far as possible, to the local subdivisions of the people of each state, a due influence in the choice of representatives, so as not to leave the aggregate minority of the people in a state, though approaching perhaps to a majority, to be wholly overpowered by the combined action of the numerical majority, without any voice whatever in the national councils."  1 Kent, *Commentaries* (12th ed., 1873) *230–31, n. (c).  Assuming acquiescence on the part of the authorities of Illinois in the selection of its Representatives by a mode that defies the direction of Congress for selection by districts, the House of Representatives may not acquiesce.  In the exercise of its power to judge the qualifications of its own members, the House may reject a delegation of Representatives-at-large.  Article I, § 5, Cl. 1.  For the detailed system by which Congress supervises the election of its members, see *e. g.*, 2 U. S. C. §§ 201–226; Bartlett, *Contested Elections in the House of Representatives* (2 vols.); Alexander, *History and Procedure of the House of Representatives* (1916) c. XVI.  Nothing is clearer than that this controversy concerns matters that bring courts into immediate and active relations with party contests.  From the determination of such issues this Court has traditionally held aloof.  It is hostile to

a democratic system to involve the judiciary in the politics of the people. And it is not less pernicious if such judicial intervention in an essentially political contest be dressed up in the abstract phrases of the law.

The appellants urge with great zeal that the conditions of which they complain are grave evils and offend public morality. The Constitution of the United States gives ample power to provide against these evils. But due regard for the Constitution as a viable system precludes judicial correction. Authority for dealing with such problems resides elsewhere. Article I, § 4 of the Constitution provides that "The Times, Places and Manner of holding Elections for . . . Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, . . ." The short of it is that the Constitution has conferred upon Congress exclusive authority to secure fair representation by the States in the popular House and left to that House determination whether States have fulfilled their responsibility. If Congress failed in exercising its powers, whereby standards of fairness are offended, the remedy ultimately lies with the people. Whether Congress faithfully discharges its duty or not, the subject has been committed to the exclusive control of Congress. An aspect of government from which the judiciary, in view of what is involved, has been excluded by the clear intention of the Constitution cannot be entered by the federal courts because Congress may have been in default in exacting from States obedience to its mandate.

The one stark fact that emerges from a study of the history of Congressional apportionment is its embroilment in politics, in the sense of party contests and party interests. The Constitution enjoins upon Congress the duty of apportioning Representatives "among the several States . . . according to their respective Numbers, . . ."

Article I, § 2. Yet, Congress has at times been heedless of this command and not apportioned according to the requirements of the Census. It never occurred to anyone that this Court could issue mandamus to compel Congress to perform its mandatory duty to apportion. "What might not be done directly by mandamus, could not be attained indirectly by injunction." Chafee, *Congressional Reapportionment* (1929) 42 Harv. L. Rev. 1015, 1019. Until 1842 there was the greatest diversity among the States in the manner of choosing Representatives because Congress had made no requirement for districting. 5 Stat. 491. Congress then provided for the election of Representatives by districts. Strangely enough, the power to do so was seriously questioned; it was still doubted by a Committee of Congress as late as 1901. See *e. g.,* Speech of Mr. (afterwards Mr. Justice) Clifford, Cong. Globe, April 28, 1842, 27th Cong., 2d Sess., App., p. 347; 1 Bartlett, *Contested Elections in the House of Representatives* (1865) 47, 276; H. R. Rep. No. 3000, 56th Cong., 2d Sess. (1901); H. R. Doc. No. 2052, 64th Cong., 2d Sess. (1917) 43; *United States* v. *Gradwell,* 243 U. S. 476, 482, 483. In 1850 Congress dropped the requirement. 9 Stat. 428, 432–33. The Reapportionment Act of 1862 required that the districts be of contiguous territory. 12 Stat. 572. In 1872 Congress added the requirement of substantial equality of inhabitants. 17 Stat. 28. This was reinforced in 1911. 37 Stat. 13, 14. But the 1929 Act, as we have seen, dropped these requirements. 46 Stat. 21. Throughout our history, whatever may have been the controlling Apportionment Act, the most glaring disparities have prevailed as to the contours and the population of districts. Appendix I summarizes recent disparities in the various Congressional Representative districts throughout the country and Appendix II gives fair samples of prevailing gerrymanders. For other illustrations of glaring inequalities, see 71 Cong. Rec.

2278–79, 2480 *et seq.;* 86 Cong. Rec. 4369, 4370–71, 76th Cong., 2d Sess. (1940); H. R. Rep. No. 1695, 61st Cong., 2d Sess. (1910); (1920) 24 Law Notes 124; (October 30, 1902) 75 The Nation 343; and see, generally, Schmeckebier, *Congressional Apportionment* (1941); and on gerrymandering, see Griffith, *The Rise and Development of the Gerrymander* (1907).

To sustain this action would cut very deep into the very being of Congress. Courts ought not to enter this political thicket. The remedy for unfairness in districting is to secure State legislatures that will apportion properly, or to invoke the ample powers of Congress. The Constitution has many commands that are not enforceable by courts because they clearly fall outside the conditions and purposes that circumscribe judicial action. Thus, "on Demand of the executive Authority," Art. IV, § 2, of a State it is the duty of a sister State to deliver up a fugitive from justice. But the fulfilment of this duty cannot be judicially enforced. *Kentucky* v. *Dennison,* 24 How. 66. The duty to see to it that the laws are faithfully executed cannot be brought under legal compulsion, *Mississippi* v. *Johnson,* 4 Wall. 475. Violation of the great guaranty of a republican form of government in States cannot be challenged in the courts. *Pacific Telephone Co.* v. *Oregon,* 223 U. S. 118. The Constitution has left the performance of many duties in our governmental scheme to depend on the fidelity of the executive and legislative action and, ultimately, on the vigilance of the people in exercising their political rights.

Dismissal of the complaint is affirmed.

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

For opinions of RUTLEDGE and BLACK, JJ., see *post,* pages 564, 566.

## APPENDIX I.

DISPARITIES IN APPORTIONMENT SHOWING DISTRICTS IN EACH STATE HAVING LARGEST AND SMALLEST POPULATIONS.

| State | 1946 | | 1928* | | 1897* | |
|---|---|---|---|---|---|---|
| | Dist. | Population | Dist. | Population | Dist. | Population |
| ALA | 9th | 459,930 | 9th | 310,054 | 2d | 188,214 |
| | 6th | 251,757 | 6th | 170,188 | 7th | 130,451 |
| ARIZ | 2 Representatives Elected at large. | | 1 Representative | | Not yet admitted | |
| ARK | 1st | 423,152 | 1st | 330,292 | 1st | 220,261 |
| | 3d | 177,476 | 3d | 180,348 | 4th | 147,806 |
| CALIF | 3d | 409,404 | 10th | 516,283 | 5th | 228,717 |
| | 21st | 194,199 | 2d | 129,357 | 4th | 147,642 |
| COLO | 1st | 322,412 | 3d | 281,170 | 2d | 207,539 |
| | 4th | 172,847 | 4th | 140,532 | 1st | 204,659 |
| CONN | 1st | 450,189 | 1st | 336,027 | 2d | 248,582 |
| | 5th | 247,601 | 5th | 224,426 | 3d | 121,792 |
| DEL | 1 Representative | | 1 Representative | | 1 Representative | |
| FLA | 1st | 439,895 | 4th | 315,292 | 2d | 202,792 |
| | 6th | 186,831 | 2d | 187,474 | 1st | 188,630 |
| GA | 5th | 487,552 | 5th | 308,364 | 2d | 180,300 |
| | 9th | 235,420 | 3d | 205,343 | 11th | 155,948 |
| IDAHO | 2d | 300,357 | 2d | 253,542 | 1 Representative | |
| | 1st | 224,516 | 1st | 178,324 | | |
| ILL | 7th | 914,053 | 7th | 560,434 | 13th | 184,027 |
| | 5th | 112,116 | 5th | 158,092 | 22d | 159,186 |
| IND | 11th | 460,926 | 7th | 348,061 | 7th | 191,472 |
| | 9th | 241,323 | 4th | 179,737 | 6th | 139,359 |
| IOWA | 2d | 392,052 | 11th | 295,449 | 11th | 203,470 |
| | 4th | 268,900 | 1st | 156,594 | 1st | 153,712 |
| KANSAS | 4th | 382,546 | 3d | 280,045 | 7th | 278,208 |
| | 3d | 249,574 | 4th | 152,378 | 1st | 167,314 |
| KY | 9th | 413,690 | 11th | 289,766 | 4th | 192,055 |
| | 5th | 225,426 | 8th | 168,067 | 7th | 141,461 |

*These years were chosen at random.

| State | 1946 | | 1928* | | 1897* | |
|---|---|---|---|---|---|---|
| | Dist. | Population | Dist. | Population | Dist. | Population |
| LA | 6th | 333, 295 | 6th | 255, 372 | 3d | 214, 785 |
| | 8th | 240, 166 | 7th | 204, 909 | 2d | 152, 025 |
| ME | 1st | 290, 335 | 1st | 195, 072 | 4th | 183, 070 |
| | 2d | 276, 695 | 2d | 188, 563 | 1st | 153, 778 |
| MD | 2d | 534, 568 | 2d | 311, 413 | 2d | 208, 165 |
| | 1st | 195, 427 | 1st | 194, 568 | 5th | 153, 912 |
| MASS | 10th | 346, 623 | 8th | 259, 954 | 5th | 174, 866 |
| | 1st | 278, 459 | 15th | 217, 307 | 6th | 169, 418 |
| MICH | 17th | 419, 007 | 6th | 533, 748 | 2d | 191, 841 |
| | 12th | 200, 265 | 10th | 198, 679 | 9th | 148, 626 |
| MINN | 6th | 334, 781 | 5th | 275, 645 | 2d | 188, 480 |
| | 9th | 283, 845 | 9th | 112, 235 | 6th | 184, 848 |
| MISS | 7th | 470, 781 | 3d | 349, 662 | 5th | 224, 618 |
| | 4th | 201, 316 | 8th | 177, 185 | 1st | 143, 315 |
| MO | 12th | 503, 738 | 10th | 521, 587 | 14th | 230, 478 |
| | 9th | 214, 787 | 8th | 138, 807 | 9th | 152, 442 |
| MONT | 2d | 323, 597 | 2d | 333, 476 | 1 Representative | |
| | 1st | 235, 859 | 1st | 215, 413 | | |
| NEB | 1st | 369, 190 | 6th | 288, 090 | 4th | 195, 434 |
| | 2d | 305, 961 | 1st | 173, 458 | 3d | 163, 674 |
| NEV | 1 Representative | | 1 Representative | | 1 Representative | |
| N. H | 2d | 247, 033 | 1st | 224, 842 | 1st | 190, 532 |
| | 1st | 244, 491 | 2d | 218, 241 | 2d | 185, 998 |
| N. J | 1st | 370, 220 | 8th | 290, 610 | 7th | 256, 093 |
| | 2d | 226, 169 | 11th | 228, 615 | 8th | 125, 793 |
| N. M | 2 Representatives Elected at large | | 1 Representative | | Not yet admitted | |
| N. Y | 25th | 365, 918 | 23d | 391, 620 | 14th | 227, 978 |
| | 45th | 235, 913 | 12th | 151, 605 | 7th | 114, 766 |
| N. C | 4th | 358, 573 | 5th | 408, 139 | 6th | 204, 686 |
| | 1st | 239, 040 | 3d | 202, 760 | 3d | 160, 288 |
| N. D | 2 Representatives Elected at large | | 2d | 220, 700 | 1 Representative | |
| | | | 3d | 210, 203 | | |

| State | 1946 | | 1928* | | 1897* | |
|---|---|---|---|---|---|---|
| | Dist. | Population | Dist. | Population | Dist. | Population |
| OHIO | 22d | 698, 650 | 14th | 439, 013 | 2d | 205, 293 |
| | 5th | 163, 561 | 11th | 167, 217 | 12th | 158, 026 |
| OKLA | 1st | 416, 863 | 3d | 325, 680 | Not yet admitted | |
| | 7th | 189, 547 | 7th | 189, 472 | | |
| ORE | 3d | 355, 099 | 1st | 346, 989 | 2d | 158, 205 |
| | 2d | 210, 991 | 2d | 160, 502 | 1st | 155, 562 |
| PA | 11th | 441, 518 | 12th | 390, 991 | 4th | 309, 986 |
| | 14th | 212, 979 | 15th | 136, 283 | 3d | 129, 764 |
| R. I | 2d | 374, 463 | 3d | 210, 201 | 1st | 180, 548 |
| | 1st | 338, 883 | 2d | 193, 186 | 2d | 164, 958 |
| S. C | 2d | 361, 933 | 7th | 266, 956 | 4th | 200, 000 |
| | 5th | 251, 137 | 2d | 203, 418 | 5th | 141, 750 |
| S. D | 1st | 485, 829 | 2d | 251, 405 | 1 Representative | |
| | 2d | 157, 132 | 3d | 138, 031 | | |
| TENN | 2d | 388, 938 | 3d | 296, 396 | 3d | 199, 972 |
| | 5th | 225, 918 | 5th | 145, 403 | 5th | 153, 773 |
| TEX | 8th | 528, 961 | 2d | 349, 859 | 6th | 210, 907 |
| | 17th | 230, 010 | 7th | 211, 032 | 1st | 102, 827 |
| UTAH | 2d | 293, 922 | 1st | 229, 907 | 1 Representative | |
| | 1st | 256, 388 | 2d | 219, 489 | | |
| VT | 1 Representative | | 2d | 176, 596 | 1st | 169, 940 |
| | | | 1st | 175, 832 | 2d | 162, 482 |
| VA | 9th | 360, 679 | 2d | 312, 458 | 9th | 187, 467 |
| | 4th | 243, 165 | 7th | 167, 588 | 2d | 145, 536 |
| WASH | 1st | 412, 689 | 1st | 348, 474 | 2 Representatives | |
| | 4th | 244, 908 | 4th | 200, 258 | Elected at large | |
| W. VA | 6th | 378, 630 | 6th | 279, 072 | 3d | 202, 289 |
| | 1st | 281, 333 | 4th | 214, 930 | 1st | 177, 840 |
| WIS | 5th | 391, 467 | 5th | 276, 503 | 6th | 187, 001 |
| | 10th | 263, 088 | 6th | 214, 206 | 10th | °149, 845 |
| WYO | 1 Representative | | 1 Representative | | 1 Representative | |

## APPENDIX II.

(1)

## ALABAMA

APPENDIX II.

(2)

## CALIFORNIA

(map of California with counties and numbered regions)

SAN FRANCISCO 4, 5 →

ALAMEDA PT.
CONTRA COSTA CO.

7-ALAMEDA PT.

12 TO 20

SCALE-STATUTE MILES
0  15  30  45  60  75

## APPENDIX II.

### (3)

# ILLINOIS

## APPENDIX II.

(4)

# PENNSYLVANIA

Mr. Justice Rutledge.

I concur in the result. But for the ruling in *Smiley v. Holm,* 285 U. S. 355, I should have supposed that the provisions of the Constitution, Art. I, § 4, that "The Times, Places and Manner of holding Elections for . . . Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations . . ."; Art. I, § 2, vesting in Congress the duty of apportionment of representatives among the several states "according to their respective Numbers"; and Art. I, § 5, making each House the sole judge of the qualifications of its own members, would remove the issues in this case from justiciable cognizance. But, in my judgment, the *Smiley* case rules squarely to the contrary, save only in the matter of degree.

Moreover, we have but recently been admonished again that it is the very essence of our duty to avoid decision upon grave constitutional questions, especially when this may bring our function into clash with the political departments of the Government, if any tenable alternative ground for disposition of the controversy is presented.[1]

I was unable to find such an alternative in that instance. There is one, however, in this case. And I think the gravity of the constitutional questions raised so great, together with the possibilities for collision above mentioned, that the admonition is appropriate to be followed here. Other reasons support this view, including the fact

---

[1] *United States v. Lovett,* 328 U. S. 303, concurring opinion at 320: "But the most fundamental principle of constitutional adjudication is not to face constitutional questions but to avoid them, if at all possible. And so the 'Court developed, for its own governance in the cases confessedly within its jurisdiction, a series of rules under which it has avoided passing upon a large part of all the constitutional questions pressed upon it for decision.' "

that, in my opinion, the basic ruling and less important ones in *Smiley* v. *Holm, supra,* would otherwise be brought into question.

Assuming that that decision is to stand, I think, with Mr. Justice Black, that its effect is to rule that this Court has power to afford relief in a case of this type as against the objection that the issues are not justiciable.

In the later case of *Wood* v. *Broom,* 287 U. S. 1, the Court disposed of the cause on the ground that the 1929 Reapportionment Act, 46 Stat. 21, did not carry forward the requirements of the 1911 Act, 37 Stat. 13, and declined to decide whether there was equity in the bill. 287 U. S. 1, 8. But, as the Court's opinion notes, four justices thought the bill should be dismissed for want of equity.[2]

In my judgment this complaint should be dismissed for the same reason. Assuming that the controversy is justiciable, I think the cause is of so delicate a character, in view of the considerations above noted, that the jurisdiction should be exercised only in the most compelling circumstances.

As a matter of legislative attention, whether by Congress or the General Assembly, the case made by the complaint is strong. But the relief it seeks pitches this Court into delicate relation to the functions of state officials and Congress, compelling them to take action which heretofore they have declined to take voluntarily or to accept the alternative of electing representatives from Illinois at large in the forthcoming elections.

The shortness of the time remaining makes it doubtful whether action could, or would, be taken in time to secure for petitioners the effective relief they seek. To force

---

[2] Want of equity jurisdiction does not go to the power of a court in the same manner as want of jurisdiction over the subject matter. Thus, want of equity jurisdiction may be waived. *Matthews* v. *Rodgers,* 284 U. S. 521, 524–525 and cases cited.

them to share in an election at large might bring greater equality of voting right. It would also deprive them and all other Illinois citizens of representation by districts which the prevailing policy of Congress commands. 46 Stat. 26, as amended; 2 U. S. C. § 2a.

If the constitutional provisions on which appellants rely give them the substantive rights they urge, other provisions qualify those rights in important ways by vesting large measures of control in the political subdivisions of the Government and the state. There is not, and could not be except abstractly, a right of absolute equality in voting. At best there could be only a rough approximation. And there is obviously considerable latitude for the bodies vested with those powers to exercise their judgment concerning how best to attain this, in full consistency with the Constitution.

The right here is not absolute. And the cure sought may be worse than the disease.

I think, therefore, the case is one in which the Court may properly, and should, decline to exercise its jurisdiction.[3] Accordingly, the judgment should be affirmed and I join in that disposition of the cause.

MR. JUSTICE BLACK, dissenting.

The complaint alleges the following facts essential to the position I take: Appellants, citizens and voters of Illinois, live in congressional election districts, the respective populations of which range from 612,000 to 914,000. Twenty other congressional election districts have populations that range from 112,116 to 385,207. In seven of

---

[3] "The power of a court of equity to act is a discretionary one. . . . Where a federal court of equity is asked to interfere with the enforcement of state laws, it should do so only 'to prevent irreparable injury which is clear and imminent.'" *American Federation of Labor* v. *Watson*, 327 U. S. 582, 593, and cases cited.

these districts the population is below 200,000.   The Illinois Legislature established these districts in 1901 on the basis of the Census of 1900.   The Federal Census of 1910, of 1920, of 1930, and of 1940, each showed a growth of population in Illinois and a substantial shift in the distribution of population among the districts established in 1901.   But up to date, attempts to have the State Legislature reapportion congressional election districts so as more nearly to equalize their population have been unsuccessful.   A contributing cause of this situation, according to appellants, is the fact that the State Legislature is chosen on the basis of state election districts inequitably apportioned in a way similar to that of the 1901 congressional election districts.   The implication is that the issues of state and congressional apportionment are thus so interdependent that it is to the interest of state legislators to perpetuate the inequitable apportionment of both state and congressional election districts. Prior to this proceeding a series of suits had been brought in the state courts challenging the State's local and federal apportionment system.   In all these cases the Supreme Court of the State had denied effective relief.[1]

In the present suit the complaint attacked the 1901 State Apportionment Act on the ground that it among other things violates Article I and the Fourteenth Amendment of the Constitution.   Appellants claim that since they live in the heavily populated districts their vote is much less effective than the vote of those living in a district which under the 1901 Act is also allowed to choose one Congressman, though its population is sometimes

---

[1] *People* v. *Thompson*, 155 Ill. 451, 40 N. E. 307; *Fergus* v. *Marks*, 321 Ill. 510, 152 N. E. 557; *Fergus* v. *Kinney*, 333 Ill. 437, 164 N. E. 665; *People* v. *Clardy*, 334 Ill. 160, 165 N. E. 638; *People* v. *Blackwell*, 342 Ill. 223, 173 N. E. 750; *Daly* v. *Madison County*, 378 Ill. 357, 38 N. E. 2d 160.   Cf. *Moran* v. *Bowley*, 347 Ill. 148, 179 N. E. 526.

only one-ninth that of the heavily populated districts. Appellants contend that this reduction of the effectiveness of their vote is the result of a wilful legislative discrimination against them and thus amounts to a denial of the equal protection of the laws guaranteed by the Fourteenth Amendment. They further assert that this reduction of the effectiveness of their vote also violates the privileges and immunities clause of the Fourteenth Amendment in abridging their privilege as citizens of the United States to vote for Congressmen, a privilege guaranteed by Article I of the Constitution. They further contend that the State Apportionment Act directly violates Article I which guarantees that each citizen eligible to vote has a right to vote for Congressmen and to have his vote counted. The assertion here is that the right to have their vote counted is abridged unless that vote is given approximately equal weight to that of other citizens. It is my judgment that the District Court had jurisdiction;[2] that the complaint presented a justiciable case and controversy;[3] and that appellants had standing to sue, since the facts alleged show that they have been injured as individuals.[4] Unless previous decisions of this Court are to be overruled, the suit is not one against the State but against state officials as individuals.[5] The complaint attacked the 1901 Apportionment Act as unconstitutional and alleged facts indicating that the Act denied appellants the full right to vote and the equal protection of the laws.

---

[2] 28 U. S. C. 41 (14); *Bell* v. *Hood*, 327 U. S. 678.

[3] *Smiley* v. *Holm*, 285 U. S. 355; *Koenig* v. *Flynn*, 285 U. S. 375; *Carroll* v. *Becker*, 285 U. S. 380; *Wood* v. *Broom*, 287 U. S. 1; *Nixon* v. *Herndon*, 273 U. S. 536, 540; *McPherson* v. *Blacker*, 146 U. S. 1, 23–24; see also cases collected in 2 A. L. R. note, 1337 *et seq.*

[4] *Coleman* v. *Miller*, 307 U. S. 433, 438, 467.

[5] *Ex parte Young*, 209 U. S. 123; *Sterling* v. *Constantin*, 287 U. S. 378, 393.

These allegations have not been denied. Under these circumstances, and since there is no adequate legal remedy for depriving a citizen of his right to vote, equity can and should grant relief.

It is difficult for me to see why the 1901 State Apportionment Act does not deny appellants equal protection of the laws. The failure of the Legislature to reapportion the congressional election districts for forty years, despite census figures indicating great changes in the distribution of the population, has resulted in election districts the populations of which range from 112,000 to 900,000. One of the appellants lives in a district of more than 900,000 people. His vote is consequently much less effective than that of each of the citizens living in the district of 112,000. And such a gross inequality in the voting power of citizens irrefutably demonstrates a complete lack of effort to make an equitable apportionment. The 1901 State Apportionment Act if applied to the next election would thus result in a wholly indefensible discrimination against appellants and all other voters in heavily populated districts. The equal protection clause of the Fourteenth Amendment forbids such discrimination. It does not permit the States to pick out certain qualified citizens or groups of citizens and deny them the right to vote at all. See *Nixon* v. *Herndon*, 273 U. S. 536, 541; *Nixon* v. *Condon*, 286 U. S. 73. No one would deny that the equal protection clause would also prohibit a law that would expressly give certain citizens a half-vote and others a full vote. The probable effect of the 1901 State Apportionment Act in the coming election will be that certain citizens, and among them the appellants, will in some instances have votes only one-ninth as effective in choosing representatives to Congress as the votes of other citizens. Such discriminatory legislation seems to me exactly the kind that the equal protection clause was intended to prohibit.

The 1901 State Apportionment Act in reducing the effectiveness of appellants' votes abridges their privilege as citizens to vote for Congressmen and violates Article I of the Constitution. Article I provides that Congressmen "shall be . . . chosen . . . by the People of the several States . . ." It thus gives those qualified a right to vote and a right to have their vote counted. *Ex parte Yarbrough,* 110 U. S. 651; *United States* v. *Mosley,* 238 U. S. 383. This Court in order to prevent "an interference with the effective choice of the voters" has held that this right extends to primaries. *United States* v. *Classic,* 313 U. S. 299, 314. While the Constitution contains no express provision requiring that congressional election districts established by the States must contain approximately equal populations, the constitutionally guaranteed right to vote and the right to have one's vote counted clearly imply the policy that state election systems, no matter what their form, should be designed to give approximately equal weight to each vote cast. To some extent this implication of Article I is expressly stated by § 2 of the Fourteenth Amendment which provides that "Representatives shall be apportioned among the several States according to their respective numbers . . ." The purpose of this requirement is obvious: It is to make the votes of the citizens of the several States equally effective in the selection of members of Congress. It was intended to make illegal a nation-wide "rotten borough" system as between the States. The policy behind it is broader than that. It prohibits as well congressional "rotten boroughs" within the States, such as the ones here involved. The policy is that which is laid down by all the constitutional provisions regulating the election of members of the House of Representatives, including Article I which guarantees the right to vote and to have that vote effectively counted: All groups, classes, and indi-

viduals shall to the extent that it is practically feasible be given equal representation in the House of Representatives, which, in conjunction with the Senate, writes the laws affecting the life, liberty, and property of all the people.

It is true that the States are authorized by § 2 of Article I of the Constitution to legislate on the subject of congressional elections to the extent that Congress has not done so. Thus the power granted to the State Legislature on this subject is primarily derived from the Federal and not from the State Constitution. But this federally-granted power with respect to elections of Congressmen is not to formulate policy but rather to implement the policy laid down in the Constitution, that, so far as feasible, votes be given equally effective weight. Thus, a state legislature cannot deny eligible voters the right to vote for Congressmen and the right to have their vote counted. It can no more destroy the effectiveness of their vote in part and no more accomplish this in the name of "apportionment" than under any other name. For legislation which must inevitably bring about glaringly unequal representation in the Congress in favor of special classes and groups should be invalidated, "whether accomplished ingeniously or ingenuously." *Smith* v. *Texas,* 311 U. S. 128, 132. See also *Lane* v. *Wilson,* 307 U. S. 268, 272.

Had Illinois passed an Act requiring that all of its twenty-six Congressmen be elected by the citizens of one county, it would clearly have amounted to a denial to the citizens of the other counties of their constitutionally guaranteed right to vote. And I cannot imagine that an Act that would have apportioned twenty-five Congressmen to the State's smallest county and one Congressman to all the others, would have been sustained by any court. Such an Act would clearly have violated the con-

stitutional policy of equal representation. The 1901 Apportionment Act here involved violates that policy in the same way. The policy with respect to federal elections laid down by the Constitution, while it does not mean that the courts can or should prescribe the precise methods to be followed by state legislatures and the invalidation of all Acts that do not embody those precise methods, does mean that state legislatures must make real efforts to bring about approximately equal representation of citizens in Congress. Here the Legislature of Illinois has not done so. Whether that was due to negligence or was a wilful effort to deprive some citizens of an effective vote, the admitted result is that the constitutional policy of equality of representation has been defeated. Under these circumstances it is the Court's duty to invalidate the state law.

It is contended, however, that a court of equity does not have the power, or even if it has the power, that it should not exercise it in this case. To do so, it is argued, would mean that the Court is entering the area of "political questions." I cannot agree with that argument. There have been cases, such as *Coleman* v. *Miller, supra,* pp. 454, 457, where this Court declined to decide a question because it was political. In the *Miller* case, however, the question involved was ratification of a constitutional amendment, a matter over which the Court believed Congress had been given final authority. To have decided that question would have amounted to a trespass upon the constitutional power of Congress. Here we have before us a state law which abridges the constitutional rights of citizens to cast votes in such way as to obtain the kind of congressional representation the Constitution guarantees to them.

It is true that voting is a part of elections and that elections are "political." But as this Court said in *Nixon*

v. *Herndon, supra,* it is a mere "play upon words" to refer to a controversy such as this as "political" in the sense that courts have nothing to do with protecting and vindicating the right of a voter to cast an effective ballot. The *Classic* case, among myriads of others, refutes the contention that courts are impotent in connection with evasions of all "political" rights. *Wood* v. *Broom,* 287 U. S. 1, does not preclude the granting of equitable relief in this case. There this Court simply held that the State Apportionment Act did not violate the Congressional Reapportionment Act of 1929, 46 Stat. 21, 26, 27, since that Act did not require election districts of equal population. The Court expressly reserved the question of "the right of the complainant to relief in equity." *Giles* v. *Harris,* 189 U. S. 475, also did not hold that a court of equity could not, or should not, exercise its power in a case like this. As we said with reference to that decision in *Lane* v. *Wilson,* 307 U. S. 268, 272–273, it stands for the principle that courts will not attempt to "supervise" elections. Furthermore, the author of the *Giles* v. *Harris* opinion also wrote the opinion in *Nixon* v. *Herndon,* in which a voter's right to cast a ballot was held to give rise to a justiciable controversy.

In this case, no supervision over elections is asked for. What is asked is that this Court do exactly what it did in *Smiley* v. *Holm, supra.* It is asked to declare a state apportionment bill invalid and to enjoin state officials from enforcing it. The only difference between this case and the *Smiley* case is that there the case originated in the state courts while here the proceeding originated in the Federal District Court. The only type of case in which this Court has held that a federal district court should in its discretion stay its hand any more than a state court is where the question is one which state courts or administrative agencies have special competence to

decide. This is not that type of question. What is involved here is the right to vote guaranteed by the Federal Constitution. It has always been the rule that where a federally protected right has been invaded the federal courts will provide the remedy to rectify the wrong done. Federal courts have not hesitated to exercise their equity power in cases involving deprivation of property and liberty. *Ex parte Young, supra; Hague* v. *C. I. O.,* 307 U. S. 496. There is no reason why they should do so where the case involves the right to choose representatives that make laws affecting liberty and property.

Nor is there any more difficulty in enforcing a decree in this case than there was in the *Smiley* case. It is true that declaration of invalidity of the State Act and the enjoining of state officials would result in prohibiting the State from electing Congressmen under the system of the old congressional districts. But it would leave the State free to elect them from the State at large, which, as we held in the *Smiley* case, is a manner authorized by the Constitution. It is said that it would be inconvenient for the State to conduct the election in this manner. But it has an element of virtue that the more convenient method does not have—namely, it does not discriminate against some groups to favor others, it gives all the people an equally effective voice in electing their representatives as is essential under a free government, and it is constitutional.

MR. JUSTICE DOUGLAS and MR. JUSTICE MURPHY join in this dissent.