M. SMITH, Circuit Judge,
with whom KOZINSKI, TALLMAN, CLIFTON, and CALLAHAN, Circuit Judges, join,
dissenting:
Elections have legal consequences. When a political leader from one party becomes president of the United States after a president from another party has occupied the White House for the previous term, the policies of the new president will occasionally clash with, and supplant, those of the previous president, often leading to changes in rules promulgated pursuant to the Administrative Procedure Act (APA), Pub.L. No. 79-404, 60 Stat. 237 (1946) (codified as amended at 5 U.S.C. § 701 et seq.). See, e.g., Animal Legal Def. Fund v. Veneman, 469 F.3d 826, 830-31 (9th Cir.2006) (withdrawal under President George W. Bush of agricultural policy announced under President Clinton), vacated en banc, 490 F.3d 725 (9th Cir.2007); Natural Res. Def. Council, Inc. v. U.S. Envtl. Prot. Agency, 824 F.2d 1146, 1149 (D.C.Cir.1987) (withdrawal under President Reagan of an emission standard from President Carter’s administration), vacated, 817 F.2d 890 (D.C.Cir.1987); Farmworker Justice Fund, Inc. v. Brock, 811 F.2d 613, 617 (D.C.Cir.1987), vacated sub nom., Farmworkers Justice Fund, Inc. v. Brock, 817 F.2d 890 (D.C.Cir.1987) (withdrawal by President Reagan’s Secretary of Labor of sanitation standard proposed under President Carter); Press Release, Department of 'the Interior, Salazar and Locke Restore Scientific Consultations under the Endangered Species Act To Protect Species and Their Habitats (Apr. 28, 2009), available at 2009 WL 1143690 (withdrawal by President Obama’s Secretary of Commerce and Secretary of Interior of rule pertaining to consultation of federal *980 wildlife experts proposed under President George W. Bush).
This phenomenon is particularly common in the period between the last few months of an outgoing administration and the first few months of an incoming administration, as was the case here. Recent legal scholarship has shed light on the concept of “midnight regulations,” whereby, during their final period in office, outgoing administrations accelerate rulemaking and agency actions, which incoming administrations then attempt to stay and reverse. See Jack M. Beermann, Midnight Rules: A Reform Agenda, 2 Mich. J. Envtl. & Admin. L. 285 (2013); Jacob E. Gersen & Anne Joseph O’Connell, Hiding in Plain Sight? Timing and Transparency in the Administrative State, 76 U. Chi. L.Rev. 1157, 1196 (2009); Anne Joseph O’Connell, Agency Rulemaking and Political Transitions, 105 Nw. U.L.Rev. 471 (2011). For example, on President Obama’s first day in office, Chief of Staff Rahm Emanuel issued a memo to the heads of federal agencies mandating that they stop the publication of regulations unless they obtained approval of the new administration. See- Memorandum from Rahm Emanuel, Assistant to the President and Chief of Staff, the White House, to Heads of Executive Departments and Agencies (Jan. 20, 2009), in 74 Fed.Reg. 4435 (Jan. 26, 2009). On the first day of President George W. Bush’s presidency, Chief of Staff Andrew Card similarly directed agencies to stop all regulatory notices. See Memorandum from Andrew H. Card, Jr., Assistant to the President and Chief of Staff, the White House, to Heads and Acting Heads of Executive Departments and Agencies (Jan. 20, 2001), in 66 Fed.Reg. 7702 (Jan. 24, 2001).
Inevitably, when the political pendulum' swings and a different party takes control of the executive branch, the cycle begins anew. There is nothing improper about the political branches of the government carrying out such changes in policy. To the contrary, such policy changes are often how successful presidential candidates implement the very campaign promises that helped secure their election. That is simply the way the modern political process works.
On the other hand, when party policy positions clash, it is improper and unwise for members of the judiciary to decide which policy view is the better one, for such action inevitably throws the judiciary into the political maelstrom, diminishes its moral authority, and conflicts with the judicial role envisioned by the Founders. As' the Supreme Court has cautioned, “[i]t is hostile to a democratic system to involve the judiciary in the politics of the people. And it is not less pernicious if such judicial intervention in an essentially political contest be dressed up in the abstract phrases of the law.” Colegrove v. Green, 328 U.S. 549, 553-54, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946), overruled on other grounds by Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).
This case involves a clash between the policies of the outgoing Clinton administration and those of the incoming George W. Bush administration. The two presidents viewed how certain aspects of the laws governing national forests should be implemented very differently. On October 13, 1999, President Clinton issued a memo to the Secretary of Agriculture, instructing him “to develop, and propose for public comment, regulations to provide appropriate long-term protection for most or all of [the] currently inventoried ‘roadless’ areas.” The United States Department of Agriculture (USDA) followed those instructions in promulgating the Roadless Area Conservation Rule, 66 Fed.Reg. 3244 (Jan. 12, 2001) (the Roadless Rule). In keeping with President Clinton’s policies, *981 the Roadless Rule emphasized “prohibit[ing] road construction, reconstruction, and timber harvest in inventoried roadless areas because they have the greatest likelihood of altering and fragmenting landscapes, resulting in immediate, long-term loss of roadless area values and characteristics.” Id.
In November 2001, after President Bush took office and sought to implement his own policy preferences respecting national forests, the USDA began a process of “reevaluating its Roadless Area Conservation Rule.” The USDA believed that “the abundance of roadless values on the Tongass, the protection of roadless values included in the Tongass Forest Plan, and the socioeconomic costs to local communities of applying the roadless rule’s prohibitions to the Tongass, all warrant treating the Ton-gass differently from the national forests outside of Alaska.” Roadless Area Conservation; Applicability to the Tongass National Forest, Alaska, 68 Fed.Reg. 75,136, 75,139 (Dec. 30, 2003) (Tongass Exemption herein). It also found that “[t]he repercussions of delaying the project planning process regarding road building and timber harvest [in the Tongass], even for a relatively short period, can have a significant effect on the amount of timber available for sale in the next year.” Slide Ridge Timber Sale Environmental Impact Statement, 66 Fed.Reg. 58710-01 (Nov. 23, 2001). The USDA ultimately modified the Clinton-era Roadless Rule due to, among other reasons, “(1) serious concerns about the previously disclosed economic and social hardships that application of the rule’s prohibitions would cause in communities throughout Southeast Alaska, (2) comments received on the proposed rule, and (3) litigation over the last two years.” Tongass Exemption, 68 Fed.Reg. at 75,137.
While the APA requires a reasoned explanation for a change in policy, “a court is not to substitute its judgment for that of the agency and should uphold a decision of less than ideal clarity if the agency’s path may reasonably be discerned.” FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513-15, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009) (internal citation and quotation marks omitted). The USDA followed President Bush’s policy instructions when it amended the Roadless Rule in 2003, 68 Fed.Reg. 75,136 (Dec. 30, 2003), and the agency’s explanation for its decision easily meets the requirements of Fox. Unfortunately, it appears that, contrary to the requirements of Fox, the majority has selected what it believes to be the better policy, and substituted its judgment for that of the agency, which was simply following the political judgments of the new administration. Accordingly, I respectfully dissent.
I. The USDA’s 2003 Change in Policy
Without acknowledging that the factual findings in the 2003 Record of Decision (ROD) rest on different policy views than those in the 2001 ROD, the majority argues that “[t]he Tongass Exemption thus plainly ‘rests upon factual findings that contradict those which underlay [the agency’s] prior policy.’ ” This conclusion is simply incorrect. The agency, following the policy instructions of the new president, weighed some of the facts in the existing record differently than had the previous administration, and emphasized other facts in the record that the previous administration had not. Stated differently, the two administrations looked at some of the same facts, and reached different conclusions about the meaning of what they saw. The second administration simply concluded that the facts called for different regulations than those proposed by the previous administration.
*982 There is little dispute that the underlying facts analyzed by the USDA had not changed meaningfully between November 2000, when the USDA completed the original rule’s Final Environmental Impact Statement (FEIS), and 2003. The USDA acknowledged as much when it considered the environmental impact of the Tongass Exemption in 2003. It concluded that “the identified new information and changed circumstances do not result in significantly different environmental effects from those described in the roadless rule FEIS. Such differences as may exist are not of a scale or intensity to be relevant to the adoption of this final rule or to support selection of another alternative from the roadless rule FEIS. Consequently, the overall decision-making picture is not substantially different from what it was in November 2000, when the roadless rule FEIS was completed.” 68 Fed.Reg. at 75,141.
Nor had the facts underlying the USDA’s assessment of the socioeconomic impact of the Tongass Exemption changed meaningfully by 2003; the USDA simply prioritized different aspects of the same socioeconomic data that it had considered in 2000. In the original Roadless Rule, the USDA had found that “[cjommunities with significant economic activities in these sectors could be adversely impacted. However, the effects on national social and economic systems are minor.... None of the alternatives are likely to have measurable impacts compared to the broader social and economic conditions and trends observable at these scales, however the effects of the alternatives are not distributed evenly across the United States.” 66 Fed.Reg. at 3261. In the 2003 ROD, on the other hand, the USDA assigned greater importance to the adverse socioeconomic impact of the Roadless Rule: “This decision reflects the facts, as displayed in the FEIS for the roadless rule and the FEIS for the 1997 Tongass Forest Plan that roadless values are plentiful in the Ton-gass and are well protected by the Ton-gass Forest Plan. The minor risk of the loss of such values is outweighed by the more certain socioeconomic costs of applying the roadless rule’s prohibitions to the Tongass. Imposing those costs on the local communities of Southeast Alaska is unwarranted.” 68 Fed.Reg. at 75,144. In 2003, then, the USDA concluded that it was important to give greater weight to some adverse socioeconomic effects than was done when the original Roadless Rule was promulgated.
Given the substantial similarity between the facts the USDA weighed in the 2003 ROD and those it weighed in the 2001 ROD, it is abundantly clear that the differences between the two are the result of a shift in policy. After analyzing essentially the same facts, the USDA changed policy course at the direction of the new president, prioritizing some outcomes over others. Fox fully envisions such policy changes. It directs courts to uphold regulations that result from such changes, even if the agency gives an explanation that is of “less than ideal clarity,” as long as “the agency’s path may reasonably be discerned.” Fox, 556 U.S. at 513-14, 129 S.Ct. 1800 (internal quotation marks and citation omitted). That requirement is clearly met here.
II. The USDA Was Not Arbitrary and Capricious
The APA requires that we set aside agency actions that are “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” 5 U.S.C. § 706(2)(A). In 2003, the USDA carefully reconsidered the facts before it, going through a full notice-and-comment process before exempting the Tongass National Forest from the Roadless Rule. The USDA was not arbitrary and capricious in making this decision.
*983 The majority contends that the USDA does not meet a key requirement under Fox — that an “agency must show that there are good reasons for the new policy.” 556 U.S. at 515, 129 S.Ct. 1800. Respectfully, the majority misconstrues Fox. Under Fox, an agency “need not demonstrate to a court’s satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates.” Id. (emphases added).
Accordingly, although the USDA only needed one good reason to change its policy, it had four independent ones, all of which are supported by the 2008 ROD: (1) resolving litigation by complying with federal statutes governing the Tongass, (2) satisfying demand for timber, (3) mitigating socioeconomic hardships caused by the Roadless Rule, and (4) promoting road and utility connections in the Tongass.
A. Litigation and Statutory Compliance
The USDA promulgated the exemption to the Roadless Rule in part to comply with statutes governing the Tongass and in response to lawsuits challenging the Road-less Rule. The Supreme Court has suggested that it is appropriate for an agency to engage in new rulemaking when litigation reveals new information. See Smiley v. Citibank (S. Dakota), N.A., 517 U.S. 735, 741, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996) (“Nor does it matter that the regulation was prompted by litigation, including this very suit.”). This is precisely what occurred here: A number of lawsuits filed against the USDA brought to light issues concerning potential conflicts between the Roadless Rule, the Alaska National Interest Lands Conservation Act (ANILCA), Pub.L. No. 96-487, 94 Stat. 2371 (1980), and the Tongass Timber Reforms Act (TTRA), Pub L. No. 101-626, 104 Stat. 4426 (1990). The majority focuses on the fact that the 2003 ROD engendered new litigation, and concludes that it was therefore arbitrary and capricious for the USDA to act in response to the earlier litigation. However, the fact that the 2003 ROD led to additional litigation says very little about whether the earlier litigation pointed to legitimate issues regarding the Roadless Rule’s compliance with various statutes ordering preservation of an adequate supply of timber to Southeast Alaskan communities whose inhabitants depend on it for their livelihood. The agency acted well within the bounds of its authority if it believed that revising the Roadless Rule would ensure compliance with the statutory mandates that had generated the original litigation.
We have previously concluded that AN-ILCA and TTRA require that the USDA balance multiple goals in the Tongass: “recreation, environmental protection, and timber harvest.” Natural Res. Def. Council v. U.S. Forest Serv., 421 F.3d 797, 808 & n. 22 (9th Cir.2005). The USDA’s 2003 ROD clearly finds that the Tongass Exemption was meant to bring the Roadless Rule in line with the purposes of ANILCA and TTRA. The USDA noted that, under ANILCA, Congress placed 5.5 million acres of Tongass in permanent wilderness status and the designation of disposition of lands in the act “represents a proper balance between the reservation of national conservation system units and those public lands necessary and appropriate for more intensive use and disposition.” 68 Fed.Reg. at 75,142. The USDA also stated that TTRA requires it to ensure that enough timber is available to “meet[ ] the annual market demand for timber” and “meet[ ] the market demand from the forest for each planning cycle.... ” 68 Fed.Reg. at 75,140.
*984 After promulgating the revised Roadless Rule, the USDA issued a press release stating that the Tongass Exemption sought to maintain “the balance for road-less area protection struck in the Tongass Land Management Plan.” The 2003 ROD also concluded that “[t]his final rule reflects the Department’s assessment of how to best implement the letter and spirit of congressional direction along with public values, in light of the abundance of road-less values on the Tongass, the protection of roadless values already included in the Tongass forest plan, and the socioeconomic costs to local communities of applying the roadless rule’s prohibitions.” 68 Fed.Reg. at 75,142.
I do not suggest that ANILCA and TTRA explicitly forbid the USDA from applying the Roadless Rule to the Ton-gass. TTRA, for example, is “[sjubject to appropriations, other applicable law, and the requirements of the National Forest Management Act....” 16 U.S.C. § 539d(a). The USDA therefore had discretion to adopt the Roadless Rule to protect wildlife, recreation, sustained use, and other values. See Natural Res. Def. Council, 421 F.3d at 801. By the same token, nothing prevented the USDA from striking a different balance and choosing to exempt the Tongass. Considering the purposes of ANILCA and TTRA, it is clear that Congress sought to promote a balance between environmental preservation, road access, and timber availability. The USDA recognized this directive in promulgating the revised rule. The Supreme Court has “long recognized that considerable weight should be accorded to an executive department’s construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations____” Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We should abide by this principle, and defer to the actions of the USDA in promulgating an exemption to the Roadless Rule.
B. Timber Demand
Likewise, the USDA’s determination that applying the Roadless Rule to the Tongass would have led to a timber shortage was not arbitrary and capricious. The majority fails to even acknowledge the agency’s effort to promote timber production, a factor which, by itself, suffices to uphold the agency’s 2003 rulemaking.
“A court generally must be ‘at its most deferential’ when reviewing scientific judgments and technical analyses within the agency’s expertise.” N. Plains Res. Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1075 (9th Cir.2011) (citation omitted). The USDA calculated that the average annual timber harvest in the Tongass between 1980 and 2002 was 269 million board feet (MMBF), which was higher than usual. The USDA estimated that in the years following the Roadless Rule, demand for timber would fall, but that demand would still be at least 124 MMBF. The USDA found that if the Roadless Rule were applied to the Tongass, the maximum timber harvest would be 50 MMBF, which would create a shortage of around 75 MMBF. The agency concluded that exempting the Tongass from the Roadless Rule would allow infrastructure to be built and boost timber production to meet national demand. 68 Fed.Reg. at 75,141-42.
C. Socioeconomic Hardships
The USDA also revised the Roadless Rule because it reconsidered socioeconomic hardships caused by applying the rule to the Tongass. The majority fails to address this justification for the Tongass Exemption, which is yet another independent basis on which to uphold the agency’s 2003 rulemaking.
*985 The district court held that the Roadless Rule would not lead to job losses because reductions in timber demand had already occurred. It suggested that the fall in timber demand would have led to job losses, even without the Roadless Rule in place. However, the district court imper-missibly substituted its factual determination for that of the agency. Although some jobs would have been lost with the fall in demand, the USDA concluded that the application of the Roadless Rule to the Tongass would have exacerbated these losses. The USDA had clear reasons to revise the Roadless Rule to mitigate job losses caused by the fall in timber demand. This decision is adequately supported by material in the record.
D. Road and Utility Connections
Finally, the USDA promulgated the Tongass Exemption to encourage road and utility construction in the Tongass, another independent factor ignored by the majority that justifies the agency’s action. Such infrastructure helps the timber industry and supports isolated communities in the national forest. The USDA found, for example, that “[t]he impacts of the roadless rule on local communities in the Tongass are particularly serious. Of the 32 communities in the region, 29 are unconnected to the nation’s highway system. Most are surrounded by marine waters and undeveloped National Forest System land.” 68 Fed.Reg. at 75,139.
E. Notice and Comment
Several of the arguments raised by Organized Village of Kake (the Village), and now affirmed by the majority, are policy-based. By overturning the Tongass Exemption, the majority conflates the process of judicial review with the agency’s review of factual and policy questions. See 5 U.S.C. § 553(c) (“After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.”).
The Village questions the merits of the USDA’s decision to exempt the Tongass by raising what are primarily policy issues that were addressed by the notice and comment process. The USDA carefully considered comments it received before promulgating the 2003 exemption. E.g., 68 Fed.Reg. at 75,138 (“The agency received comments regarding the effects the proposed exemption from the roadless rule would have on the natural resources of the Tongass. Some respondents expressed their view that 70 percent of the highest volume timber stands in Southeast Alaska have been harvested, and exempting the Tongass from the roadless rule would lead to the harvest of most or all of the remainder of such stands.”); 68 Fed.Reg. 41,864, 41,865 (July 15, 2003) (“All interested parties are encouraged to express their views in response to this request for public comment on the following question: Should any exemption from the applicability of the roadless rule to the Tongass National Forest be made permanent and also apply to the Chugach National Forest?”). As long as the agency’s decision has clear factual support in the record, as is the case here, it is not our place to substitute our policy preferences for those of the agency. See Fox, 556 U.S. at 513-14, 129 S.Ct. 1800.
III. National Environmental Policy Act (NEPA) Claims
The Village claims that the USDA violated NEPA by neglecting to prepare a new environmental impact statement and by failing to consider alternatives to exempting the Tongass. The district court *986 did not reach this issue because it reversed the agency on other grounds. Given my disagreement with the majority, I would remand to tlje district court to consider the NEPA claims in the first instance.
I respectfully dissent.