**James SAILORS and Loretta Sailors, Seymour Koning and Mildred Koning, Grazzi Mullay and Rosalie Mullay, and the Board of Education of the City of Grand Rapids, a second class school district, Plaintiffs,**

**William A. Duthler and Anna M. Duthler, Harvey A. Duthler and Edna M. Duthler, and the City of Grand Rapids, a municipal corporations, Intervening Plaintiffs,**

**v.**

**The BOARD OF EDUCATION OF the COUNTY OF KENT, and Victor Weller, Dewey Jaarsma, Mary I. Keeler, Russell Emmons, and C. B. Leaver, as members thereof, and the Kentwood Public Schools, a school district of the fourth class, Defendants,**

**Attorney General of the State of Michigan, Intervening Defendant.**

**Civ. A. No. 4480.**

United States District Court
W. D. Michigan, S. D.

May 2, 1966.

Dutchess, Mika, Miles, Meyers, Merdzinski & Snow, Grand Rapids, Mich., Wendell A. Miles, Grand Rapids, Mich., of counsel, for individual plaintiffs and individual intervening plaintiffs, and of counsel for plaintiff Board of Education.

McDonald & Anderson, Grand Rapids, Mich., Roger D. Anderson, Grand Rapids, Mich., of counsel, for plaintiff Board of Education, of counsel, for individual plaintiffs and individual intervening plaintiffs.

Steven L. Dykema, City Atty., Grand Rapids, Mich., for intervening plaintiff, The City of Grand Rapids.

VanderVeen, Freihofer & Cook, Grand Rapids, Mich., George R. Cook, Grand Rapids, Mich., of counsel, for The Board of Education of County of Kent, and individual defendants.

Paul O. Strawhecker, Grand Rapids, Mich., for defendant Kentwood Public Schools.

Eugene Krasicky, Asst. Atty. Gen., for intervening defendant, Attorney General of State of Michigan.

Before O'SULLIVAN, Circuit Judge, KENT, Chief District Judge, and FOX, District Judge.

FOX, District Judge (dissenting in part).

This is an action brought by plaintiffs Sailors, Koning, and Mullay, and intervening plaintiffs Duthler, all formerly school electors of defendant Kentwood Public Schools, against the Board of Education of the County of Kent (hereinafter called "Board"), and Kentwood Public Schools, a local school district. Suit was commenced on February 15, 1963.

As additional parties plaintiff in this case, there appear the City of Grand Rapids, and the Board of Education of the City of Grand Rapids, a second-class school district.

By popular vote of February 1962, three areas of Paris Township (Breton Avenue, Kendall, and Fuller-44th Street) were annexed to the City of Grand Rapids. Concomitantly, these areas were detached from defendant Kentwood school district and annexed to the plaintiff City of Grand Rapids school district. The annexation became effective on December 31, 1962.

A fourth area (Alger Street) was detached and annexed by vote of the legislative bodies of the township and city, and that territory likewise shifted school districts.

On January 1, 1963, the Board of Education of the defendant Kentwood Public Schools requested defendant Board to detach these four areas from plaintiff school district and transfer them to defendant Kentwood Public Schools.

Defendant Board accepted the transfer petitions, gave the statutory notice of its meeting, and on February 25, 1963, granted the transfer request without written opinion.

Plaintiffs appealed the decision to the State Board of Education, which entered an amended order on June 5, 1963, exempting the property of the original plaintiffs from the transfer, as well as that of two other lot owners. Again, no written opinion was given.

By way of relief, plaintiffs seek to have this court set aside the transfers subsequent to the effective date of annexation, to declare that the defendant Board is unconstitutionally constituted, to enjoin any further elections until the misrepresentation is brought into balance, and to declare that the absence of any statutory standards governing the decisions of the county board of education is violative of the Fourteenth Amendment due process guarantees, and constitutes an improper delegation of legislative authority.

Defendants contend that the court has no jurisdiction over the subject matter of the complaint, and that it has no power to set aside the acts of an allegedly malapportioned legislature.

Members of the county boards of education are elected in accordance with the procedure set forth in Michigan Statutes Annotated 15.3291 and ff., Comp.Laws 1948, § 340.291 et seq. [P.A.1955, No. 269]. This is essentially a unit system of voting—each school district within the county receives one vote in the election of each of the five members of the county board.

By amendments to the law effective March 28, 1963 (M.S.A. 15.3294(1) and ff., Comp.Laws 1948, § 340.294a et seq. [P.A.1962, No. 190]), provision for popular election of county board members is available upon request of a majority of the local school boards, representing more than 50% of the children on the last school census.

These elections are held biennially on the first Monday of June, to select replacements for members whose terms have expired. Under the applicable provision, not more than two members of the board may come from any one school district.

The county board of education exercises legislative, administrative, and quasi-

judicial functions. Among these are the levying of *ad valorem* property taxes; collecting data on delinquent taxes; arranging for the taking of the school census; preparation of an annual budget; authority over special education programs and programs for the retarded; and authority to transfer territory from one school district to another.

In the present case, wide variation in the populations of the constituent school districts is prevalent. Nelson School District has a population of 99, and exercises one unit vote. Hoag School District has a population of 111, and one unit vote; Dodge School District, population 117 and one unit vote; Ashley School District, population 145 and one unit vote; Grand Rapids School District, population 201,777, or 55.6% of all people in Kent County, and one unit vote. (According to the 1960 decennial census.) In 1964 there were 39 school districts within Kent County. Thus in several school districts in Kent County, the voting strength of one voter approximates the voting strength of 200 voters in the Grand Rapids School District.

Furthermore, plaintiff Grand Rapids School District has 48.04% of the total number of school-age children in Kent County (1963 school census).

Similar inequality is found in the property valuation figures for the respective school districts.

The primary question is whether or not the guarantees of the equal protection clause of the Fourteenth Amendment to the Federal Constitution are extended to electors of local school boards in the State of Michigan, which local boards elect intermediate (county) boards of education in accordance with a system paralleling the "county-unit" system invalidated by the Supreme Court in Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963).

At oral argument learned counsel for defendant Kentwood School District pressed on the court the admonition not to enter the "political thicket." This phrase was coined by Mr. Justice Frank-

furter in his opinion in the case of Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946), which sought to invalidate a scheme of state congressional districts for the reason that they differed greatly in population.

"To sustain this action would cut very deep into the very being of Congress. *Courts ought not to enter this political thicket.* The remedy for unfairness in districting is to secure State legislatures that will apportion properly, or to invoke the ample powers of Congress. The Constitution has many commands that are not enforceable by courts because they clearly fall outside the conditions and purposes that circumscribe judicial action." (Emphasis supplied.) Id. at 556, 66 S.Ct. at 1201.

Mr. Justice Frankfurter's opinion in that case represented the views of three members of the court. Mr. Justice Rutledge joined in the result, giving a majority, expressing the view that the question was judicially cognizable, but that the particular case did not call for an exercise of the Court's jurisdiction.

In the decision in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the majority held that lower federal courts have jurisdiction of the subject matter of a suit attacking a state apportionment act as unconstitutional on the grounds that it deprives the plaintiff of equal protection of the laws by debasing his vote, that a state apportionment statute violates the equal protection clause by effecting a gross disproportion in representation of the voting population, and that a person qualified to vote for members of a state legislature has standing to challenge a state legislative apportionment statute as violative of the Fourteenth Amendment equal protection clause.

Justices Frankfurter and Harlan dissented on the grounds of non-justiciability.

In the spate of cases subsequently decided by the Supreme Court upholding the right to challenge malapportionment

of state legislatures, the lone dissenter from that proposition has been Mr. Justice Harlan.

In Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), Mr. Chief Justice Warren, in the opinion of the court, stated:

*"We are cautioned about the dangers of entering into political thickets and mathematical quagmires. Our answer is this:* 'A denial of constitutionally protected rights demands judicial protection; our oaths and our office require no less of us.' As stated in Gomillion v. Lightfoot, supra: [364 U.S. 339, 5 L.Ed.2d 110, 81 S.Ct. 125], 'When a state exercises power wholly within the domain of state interest, it is insulated from federal judicial review. *But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right.'*

"To the extent that a citizen's right to vote is debased, he is that much less a citizen. * * * But the basic principle of representative government remains, and must remain, unchanged—the weight of a citizen's vote cannot be made to depend upon where he lives. Population is, of necessity, the starting point for consideration and the controlling criterion for judgment in legislative apportionment controversies. A citizen, a qualified voter, is no more nor no less so because he lives in the city or on the farm. This is the clear and strong command of our Constitution's Equal Protection Clause. This is an essential part of the concept of a government of laws and not men. This is at the heart of Lincoln's vision of 'government of the people, by the people, [and] for the people'." (Emphasis supplied.) Id. at 377 U.S. 566–567, 84 S.Ct. at 1384.

The clear import of this language and of all the decisions handed down since that in Baker v. Carr, supra, is that the "political thicket" has been entered, courts will entertain actions of this nature, and relief will be granted in the proper case. Under the well established doctrine of *stare decisis,* then, the argument of counsel that this court ought not involve itself in a controversy of this sort is palpably untenable.

As to the standards to be applied, Mr. Chief Justice Warren, again in Reynolds v. Sims, supra, made the following observations:

"We indicated in Baker, however, that the Equal Protection Clause provides discoverable and manageable standards for use by lower courts in determining the constitutionality of a state legislative apportionment scheme, and we stated:

'Nor need the appellants, in order to succeed in this action, ask the Court to enter upon policy determinations for which judicially manageable standards are lacking. Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects *no* policy, but simply arbitrary and capricious action.' " (Footnote omitted.) Id. at 377 U.S. 557, 84 S.Ct. at 1379.

(Discussing Gray v. Sanders, supra):

"Continuing, we stated that 'there is no indication in the Constitution that homesite or occupation affords a permissible basis for distinguishing between qualified voters within the state.' And, finally, we concluded: 'The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote.' " (Footnote omitted.) Id. at 377 U.S. 558, 84 S.Ct. 1379.

The power of the court to act in this situation is thus clear—the question remains as to whether it should forbear from acting, and this requires a scrutiny of the facts in light of the Supreme Court cases.

Initially, there can be no question, from the most cursory glance at the facts of this case, that there is a gross disparity, amounting to invidious discrimination, between the representation afforded the Grand Rapids School District on the Kent Intermediate Board of Education and the representation of other constituent school districts on the Board. In the use of the term "invidious," I in no way convey any connotation of bad faith. For a legislature, acting with the best of intentions in passing legislation of the type here concerned, may inadvertently provide the means by which "sophisticated discrimination" may result from the execution of the statute's provisions.[1]

We must now inquire as to whether or not this court should refrain from acting because the controversy before it concerns government on the county level, while the decided Supreme Court cases have thus far applied the guarantees of the equal protection clause of the Fourteenth Amendment only to voters' rights on the state level.

"Political subdivisions of States—counties, cities, or whatever—never were and never have been considered as sovereign entities. Rather, they have been traditionally regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions. As stated by the Court in Hunter v. City of Pittsburgh, 207 U.S. 161, 178, 28 S.Ct. 40, 46, 52 L.Ed. 151, [159,] these governmental units are 'created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them,' and the 'number, nature and duration of the powers conferred upon [them] * * * and the territory over which they shall be exercised rests in the absolute discretion of the state.'" Reynolds v. Sims, supra, at 377 U.S. 575, 84 S.Ct. at 1388.

In City of Muskegon v. County of Muskegon, File No. 15983, Muskegon Circuit Court, the court said:

"The County, on the other hand is a political subdivision of the state. It is superimposed by a sovereign and paramount authority, as a governmental agent of the State, to perform primarily the functions of the State locally and within its boundaries. It is a 'body politic and corporate'. It is created as an arm of the sovereign government of the State for purposes essential to the proper functioning of that government in matters which relate to the civil administration, finances, maintenance of the peace, public welfare, and especially for the administration of justice through the maintenance of courts of original trial jurisdiction, such as the Circuit Court. This latter function, of course, includes the establishment of jails for the confinement and punishment of those who have been guilty of offenses against the criminal laws of the State of Michigan.

"The County is generally a subordinate part of the sovereignty of the State itself. 20 C.J.S. [Counties] [p.] 753, Section 1; 14 Am.Jur. 186, Sec. 4. There is a logical basis for drawing distinction between Counties and ordinary municipal corporations, Cities. Counties are created by the State in the exercise of its own sovereign power without the particular solicitation, consent, or concurrence of the people who inhabit them. In Michigan, the Counties owe their creation to the constitution and statutes which confer upon them all the powers they possess, prescribe their duties and impose the liabilities to which they are subject. With scarcely an exception, all the powers and the functions of the County organization have a direct and exclusive reference to the general policies of the State of Michigan, and, in fact, counties are only a branch of the general administration of that policy.

1. See WMCA v. Lomenzo, 377 U.S. 633, 653, 84 S.Ct. 1418, 12 L.Ed.2d 568, 580 (1964).

"On the other hand, municipal corporations, such as chartered cities, are more amply endowed with corporate life and function. They exist under general or special charters conferred at the direct solicitation or by the free consent of the people who compose them. They are created chiefly for the interest, advantage and convenience of their inhabitants. The distinction between a municipal corporation and a political subdivision of the state, such as a County, relates both to the purposes for which they are created and the method of their creation.

"Thus, the organization of the City is asked for, or at least, consented to by the people it embraces. A County is imposed by a sovereign and paramount authority, it is created by the sovereign power of the State, of its sovereign will, without the particular solicitation, consent or concurrent action of the people who inhabit them. Bar v. Schintz, [State ex rel. Bare v. Schinz] 194 Wis. 397, 216 N.W. 509; McQuillan on Municipal Corporations, Section 12, Vol. 1; Young vs. [Juneau] Juno County, 192 Wis. 646, 212 N.W. 295; Miller vs. Manistee Board of Road Commissioners, 297 Mich. 487 [298 N.W. 105, 136 A.L.R. 575]; City of Detroit v. O'Connor, 302 Mich. 531 [5 N.W.2d 453]; Crowley vs. Clark County, [219 Wis. 76] 261 N.W. 221; Campbell vs. Board of Commissioners, 30 F.2d 910; County of Door vs. [Plumbers Steamfitters Refrigeration etc.] A. F. of L., et al. 4 Wis. 2nd, 142, 89 N.W.2d 920 (1958); Green County vs. City of Monroe, [3 Wis.2d 196, 87 N.W.2d 827] supra."

Obviously, therefore, the Kent Intermediate Board of Education is an arm of the State, albeit acting on a local level.

The Supreme Court has made crystal clear, in sweeping language, the right which is involved in these cases. Beginning with Gray v. Sanders, supra, which dealt with statewide primaries for United States Senator and state officers,

Mr. Justice Douglas stated the majority view to be:

"Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote—whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment." Id. at 372 U.S. 379, 83 S.Ct. 808.

This view continues through Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), involving congressional elections, in which Mr. Justice Black stated that "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's," (Id. at 376 U.S. 8, 84 S.Ct. 530), and culminates with Reynolds v. Sims, supra, in which it was held that both houses of state legislatures must be apportioned on a population basis, Mr. Chief Justice Warren commenting that "the fundamental principle of representative government in this country is one of equal representation for equal numbers of people, without regard to race, sex, economic status, or place of residence within a State." (Id. at 377 U.S. 560–561, 84 S.Ct. 1381).

Thus, it is beyond objection that it is the right to vote on an equal basis, whether under Article I, § 2, of the Federal Constitution, or the Equal Protection Clause of the Fourteenth Amendment, which is guaranteed in these cases.

Nakedly implicit in this proposition is that equal voting rights carry a right to fair representation of the voting public by the elected official.

"But representative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative bodies. Most citizens can achieve this

participation only as qualified voters through the election of legislators to represent them. Full and effective participation by all citizens in state government requires, therefore, that each citizen have an equally effective voice in the election of members of his state legislature. Modern and viable state government needs, and the Constitution demands, no less." Reynolds v. Sims, supra, at 377 U.S. 565, 84 S.Ct. 1383.

Numerous courts have passed favorably on the proposition that the effect of these decisions does reach the statewide level. See Ellis v. Mayor and City Council, 352 F.2d 123 (CCA 4, 1965); Bianchi v. Griffing, 238 F.Supp. 997 (D.C.E.D. N.Y., 1965); Damon v. Lauderdale County Election Commissioners, C.A. 1197–E (D.C.S.D.Miss., October 21, 1964); State ex rel. Sonneborn v. Sylvester, 26 Wis.2d 43, 132 N.W.2d 249 (1965); and Brouwer v. Bronkema, Case No. 1855 (Kent County, Michigan, Circuit Court, September 11, 1964).[2] I am convinced that the facts of this case admit of no other course than to reach a similar decision.

In the Bianchi case, supra, the order of the three-judge court retaining jurisdiction pending political action in reapportioning a county board of supervisors, denying a requested injunction and defendants' motion to dismiss, was appealed to the United States Supreme Court by the defendants. Plaintiff-appellee moved to dismiss the appeal on the grounds that it was an attempt to appeal a nonreviewable order.

Although defendant-appellants' brief (p. 8) raised the "vitally important question of whether the Equal Protection Clause of the Fourteenth Amendment in respect to reapportionment extends to the lowest level of local government," the Supreme Court in a one-line opinion stated: "The motion to dismiss is granted

and the appeal is dismissed for want of jurisdiction." 382 U.S. 15, 86 S.Ct. 52, 15 L.Ed.2d 11 (1965).

Although the Supreme Court was squarely faced with the issue of whether or not the trial court had jurisdiction in cases involving equality of voting rights for election of officials in county and local units of government, it chose to decide the Bianchi case on the narrow ground of lack of jurisdiction under 28 U.S.C. § 1253 (because the order appealed from was not, in the Court's view, a final order), thus leaving the case in precisely the same status as my decision in the instant case.

The Kent Intermediate Board of Education, as do all such Boards in the State of Michigan, exercises powers of a legislative, as well as administrative and quasi-judicial, character. When questioned as to the nature of the Intermediate Boards of Education, specifically, whether or not they were representative bodies, the Assistant Attorney General averred that he did not think so, in the accepted sense of the term. He also contended that plaintiffs here had no judicially cognizable right in the territory of the school district, and therefore were without standing to prosecute this action.

As pointed out above, the right involved is the right to vote for a representative body, and it cannot be seriously contended that the Kent Intermediate Board of Education, and its kin across the State, are not representative bodies.

Most apparent is the fact that they are originally organized on a county basis. As such, they dictate, direct and supervise general operations of schools within the county. Obviously they would not be established on a county, or any other geographical basis, unless intended to represent that particular area.

Of significance also is the following quotation from the case of School Dis-

---

2. The Brouwer case was the first case decided after Reynolds v. Sims, supra, which applied its rule on the county level. Judge Fred N. Searl's cogent opinion in that case has drawn the well deserved attention of the courts above and is certain to figure prominently in the work of textwriters. See, for example, Weinstein, The Effect of Federal Reapportionment Decisions on Counties and Other Forms of Municipal Government, 65 Col.L.R. 21, note 2.

trict of the City of Lansing v. State Board of Education, 367 Mich. 591, 116 N.W.2d 866, 868:

"Unlike the delegation of other powers by the legislature to local governments, education is not inherently a part of the local self-government of a municipality except insofar as the legislature may choose to make it such. Control of our public school system is a State matter delegated and lodged in the State legislature by the Constitution. The policy of the State has been to retain control of its school system, to be administered throughout the State under State laws by local State agencies organized with plenary powers to carry out the delegated functions given it by the legislature."

An analysis of this state of affairs leads to the unalterable conclusion stated above. In these days of growing national concern over the status of education in this country, it need hardly be stated that education is a matter of intense importance to the population.

In Michigan, this public school system is "delegated and lodged in the State legislature by the Constitution." The Michigan legislature, in accordance with the apportionment decisions of the United States Supreme Court, has redistricted itself and acts as an apportioned body. This legislature has also undertaken hearings on the problem of establishing county boards of supervisors on a representative basis, thus showing its responsiveness to recent court decisions.

Thus, under the Michigan Constitution, Article VIII, Section 2, education of the children of the citizens of this State is to be provided for by the state legislature, an apportioned body, fairly representative of the people of the State.

The legislature, through the statute challenged here, has delegated its functions in this area to a local state agency, to be carried out by that agency. The method by which this is done has already been explained, and results in the virtual muting of the voices of 55.6% of the people in Kent County in the area of public education.

Thus, to permit this system to stand would be to allow the legislature to completely nullify the result of Reynolds v. Sims, supra, by simply delegating powers under the same sort of scheme as now exists for the election of members of the Kent Intermediate Board of Education. For even though members of local school districts are elected by popular election, the election of the five members of the Intermediate Board is by majority vote of the constituent school districts in the county, regardless of the respective populations of the several school districts.

The Supreme Court has spoken clearly on this point:

"However complicated or sophisticated an apportionment scheme might be, it cannot, consistent with the Equal Protection Clause, result in a significant undervaluation of the weight of the votes of certain of a State's citizens merely because of where they happen to reside." WMCA v. Lomenzo, 377 U.S. 633, 653, 84 S.Ct. 1418, 12 L.Ed.2d 568, at 580.

And again, in Reynolds v. Sims, supra, the Court said:

"And, if a State should provide that the votes of citizens in one part of the State should be given two times, or five times, or 10 times the weight of votes of citizens in another part of the State, it could hardly be contended that the right to vote of those residing in the disfavored areas had not been effectively diluted. It would appear extraordinary to suggest that a State could be constitutionally permitted to enact a law providing that certain of the State's voters could vote two, five, or 10 times for their legislative representatives, while voters living elsewhere could vote only once. And it is inconceivable that a state law to the effect that, in counting votes for legislators, the votes of citizens in one part of the State would be multiplied by two, five, or 10, while the votes of persons in another area would be counted only at face value, could be constitutionally sustainable. * * *

The resulting discrimination against those individual voters living in disfavored areas is easily demonstrable mathematically. Their right to vote is simply not the same right to vote as that of those living in a favored part of the State. Two, five, or 10 of them must vote before the effect of their voting is equivalent to that of their favored neighbor. Weighting the votes of citizens differently, by any method or means, merely because of where they happen to reside, hardly seems justifiable. One must be ever aware that the Constitution forbids 'sophisticated as well as simple-minded modes of discrimination.' Lane v. Wilson, 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281, 1287; Gomillion v. Lightfoot, 364 U.S. 339, 342, 81 S.Ct. 125, 127, 5 L.Ed. 110, 113. As we stated in Wesberry v. Sanders, supra [376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481]:

'We do not believe that the Framers of the Constitution intended to permit the same vote-diluting discrimination to be accomplished through the device of districts containing widely varied numbers of inhabitants. To say that a vote is worth more in one district than in another would * * * run counter to our fundamental ideas of democratic government.' " Id. at 377 U.S. 562–563, 84 S.Ct. 1382.

To say that a citizen, guaranteed by his state constitution that the public education of his children shall be provided for by the state legislature, an apportioned body directly responsible to him, can be denied this fair representation by the action of that legislature in delegating this function to a statutorily created agency of the state which is not responsive to the population on an equal representation basis, is to be completely out of spirit with the announced decisions of the United States Supreme Court, and allows a limitless circumvention of the rule posited by that Court in Reynolds v. Sims, supra.

True it may be that a Michigan citizen has no inherent right to vote for matters concerning education. Suffice it to say that the Michigan Constitution provides that such a person will be fairly represented in such matters.

However, in the instant case the legislature has chosen to give citizens of Michigan such a right, and the argument that since such a right is a matter of grace with the legislature it can be rendered inconsequential by the bestowing hand is sophistry of the highest order.

More importantly, as noted in Reynolds v. Sims, supra, the right to vote is personal. Once it is conferred by the state, "all who participate in the election are to have an equal vote." Gray v. Sanders, supra, at 372 U.S. 379, 83 S.Ct. 808.

Although the manner in which a state distributes power among its governmental organs is commonly a question for the state itself, Highland Farms Dairy, Inc. v. Agnew, 300 U.S. 608, 612, 57 S.Ct. 549, 81 L.Ed. 835, 840 (1937), the state in distributing such power shall not use it "as an instrument for circumventing a federally protected right." Gomillion v. Lightfoot, 364 U.S. 339, at 347, 81 S.Ct. 125, 5 L.Ed.2d 110, at 117 (1960).

In point of fact a Michigan citizen can vote for the person responsible for providing for his child's education—his elected representative in the legislature, and Reynolds v. Sims, supra, guarantees him that his vote will be counted equally, or nearly so, with that of every other vote. Under the arrangement now countenanced by M.S.A. 15.3294(1) and ff., the value of that vote on educational matters is greatly weakened. Thus, we see the voting power of some qualified voters grossly dilated, while that of others is grossly diluted. This is a classic situation of sophisticated invidious discrimination, and the statute to this extent must be declared unconstitutional.

We are not here concerned with the nature or structure of governmental units as such. The relevance of "one man, one vote" to the present case is not an extension of the rule laid down by Reynolds v. Sims, supra, but, rather it is

a precise application of Reynolds to its intended purpose—to secure a constitutionally protected right to individual citizens. Under the authority of Reynolds and other decisions of the United States Supreme Court herein discussed, I can see no warrant to arbitrarily cut off the citizens' right to fair representation at the county level.

Since the majority opinion differs substantially as to the consequences of my conclusion, it may be well at this point to indicate exactly what is and what is not involved here. This is not a situation in which the legislature has appointed a commission or board—no one is contending for a right to vote for appointed officials. The legislature has not chosen to appoint Boards for each of the Intermediate School Districts in the State of Michigan, in which case the function of providing for public education would be delegated, but not, legislatively speaking, the responsibility. For in that situation, the legislature would have delegated the function of providing for public education, but the appointees would have been directly responsible to the legislature, an equally apportioned body directly responsible to the people.

But here the legislature has delegated not only the function, but also the responsibility, which would not be objectionable but for the gross malapportionment in the existing system of selecting the Board. For under that system the members of the Board are not directly responsible to the legislature, but to the people by reason of the vote which the legislature has given them through M.S.A. 15.3294(1) and ff. Since the vote is not given on a fairly apportioned basis, the responsibility is fractionalized, and the Board is, in effect, more responsible to the minority than to the majority.[3]

The Assistant Attorney General has argued that the statute itself provides for popular election of board members (M.S.A. 15.3294(2) (3), Comp.Laws 1948, §§ 340.294b, 340.294c [P.A.1962, No. 190]), and that certain reorganized districts have popularly elected Boards, as provided in M.S.A. 15.3302(1), Comp. Laws 1948, § 340.302a [P.A.1962, No. 190].

The procedure outlined in M.S.A. 15.-3294(2) and (3) is constitutionally unacceptable, requiring as it does that a majority of constituent school districts, representing more than 50% of the children on the last school census in the county district, must adopt resolutions in favor of such a procedure. The problem with this plan is that the Grand Rapids School District, with 48.04% of the school-age children in the Kent Intermediate School District, and 55.6% of the total population, would need the votes of nineteen other school districts (there being a total of 39 in Kent County) to bring about a popular election. Thus again, patently, a small minority has effective power to frustrate the will of the great majority.

As to those intermediate school districts now functioning under popularly elected Boards, as provided by M.S.A. 15.-3302(1), no problem is envisioned, since that statute is not attacked and a Board which is fairly representative would not be subject to attack.

Following the well established principle that the acts of a *de facto* body have full legal effect, the court is not disposed to grant plaintiffs this facet of the relief they seek. The possible harm in setting a precedent of this sort, even on the facts of this case, is viewed as more to be shunned than the harm resulting to individual plaintiffs by allowing the transfer to stand. Orderly functioning of government demands no less. See Johnson v. Genesee County, 232 F.Supp. 567 (E.D. Mich., 1964); Scholle v. Hare, 367 Mich.

3. For one writer's view of the status of county government after the recent Supreme Court decisions, see Weinstein, supra, Note 1. Professor Weinstein seems to be of the opinion that, although a person does not necessarily have a right to participate in the control of every state agency, when a state agency is controlled by voters, all voters must be treated as equally as possible. Id. at 33.

176, 116 N.W.2d 350; Williams v. Secretary of State, 145 Mich. 447, 108 N.W. 749; and State ex rel. Sonneborn v. Sylvester, supra.

The preferable course is to allow a properly apportioned body to remedy whatever ills have come about by acts of its malapportioned state, and this is the policy which this court will follow.

The rights involved in this case being voting rights, and as such, personal, plaintiff Board of Education of the City of Grand Rapids and intervening plaintiff City of Grand Rapids are held to have insufficient standing to remain as parties to this action. This is succinctly stated in Reynolds v. Sims, supra.

"As stated by the Court in United States v. Bathgate, 246 U.S. 220, 227, 38 S.Ct. 269, 271, 62 L.Ed. 676, 680, '[t]he right to vote is personal * * *' 39

39. As stated by Mr. Justice Douglas, the rights sought to be vindicated in a suit challenging an apportionment scheme are 'personal and individual,' South v. Peters, 339 U.S., at 280, 70 S.Ct. at 643, 94 L.Ed. 838, and are 'important political rights of the people,' MacDougall v. Green, 335 U.S. 281, 288, 69 S.Ct. 1, 93 L.Ed. 3 (Douglas, J., dissenting.)"

Id. at 377 U.S. 561, 84 S.Ct. 1381. (Footnote by the Court.)

However, the parties should be permitted to remain in the case as amicus curiae.

Finally, there is a motion before the court to add the State Board of Education as a party defendant. Plaintiffs allege that their appeal of the decision to transfer the disputed area to the Kentwood School District, seeking to have them transferred back to the Grand Rapids School District, was decided in an arbitrary and capricious manner, and without due process of law. The State Board did place individual plaintiffs in the Grand Rapids School District.

By decision of this court, whereby it will not overturn the acts of the *de facto* Kent Intermediate Board, it would appear that the issue on this particular point is moot, unless individual plaintiffs desire a complete return to the status quo, and wish to be placed once more in the Kentwood District, which is apparently not the case.

Thus, M.S.A. 15.3294(1) and ff. should be declared to be unconstitutional as in violation of the Equal Protection Clause of the Fourteenth Amendment, insofar as Board elections are concerned.

This court should retain jurisdiction of the action and unless the 1966 legislature were to take reasonable steps to correct this legislation in accordance with this opinion, allow plaintiffs to apply for additional relief.

## APPENDIX

Since the writing of this opinion, two cases reaching opposite results on the question here presented have been considered by the Supreme Court of the State of Michigan. (Brouwer v. Bronkema, 141 N.W.2d 98, Knudsen v. Klevering, 141 N.W.2d 120, opinions filed April 5, 1966 [Black, J., filed an opinion April 6, 1966, which created an even split on the decision]).

That court divided evenly on the issue raised by those two cases (which is the issue here), thus leaving the matter in a status which, at best, can be characterized as confused.

Thus, a citizen of Michigan has no effective recourse in situations such as this save the Federal Court.

Citizens of other states have been afforded relief from this type of malapportionment on boards of supervisors, Bianchi v. Griffing, supra (N.Y.), Damon v. Lauderdale County Election Commissioners, supra (Miss.), State ex rel. Sonneborn v. Sylvester, supra (Wis.); on a city council, Ellis v. Mayor and City Council, supra (Md.); and on a district school board, Delozier v. Tyrone Area School Board, 247 F.Supp. 30 (D.C.W.D.Pa., 1965).

The scope of the Fourteenth Amendment's equal protection clause is not so restricted as to overlook discrimination on the slender basis that it occurs at the county level. The protection of that Amendment is extended to anyone whose constitutional rights have been impinged

by invidiously discriminatory state action, wherever that action may ultimately occur. See, e. g., Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

Justice Matthews' opinion in Yick Wo is apropos and prophetic. At page 370, 118 U.S., at page 1071, 6 S.Ct., he said:

"But the fundamental rights to life, liberty, and the pursuit of happiness, considered as individual possessions, are secured by those maxims of constitutional law which are the monuments showing the victorious progress of the race in securing to men the blessings of civilization under the reign of just and equal laws, so that, in the famous language of the Massachusetts Bill of Rights, the government of the commonwealth 'may be a government of laws and not of men.' For the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself.

"There are many illustrations that might be given of this truth, which would make manifest that it was self-evident in the light of our system of jurisprudence. The case of the political franchise of voting is one. Though not regarded strictly as a natural right, but as a privilege merely conceded by society, according to its will, under certain conditions, nevertheless it is regarded as a *fundamental political right, because preservative of all rights.*" (Emphasis supplied.)

The right to vote is a fundamental right which ranks in importance along with freedom of speech, press, assembly, and religion. NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); DeJonge v. State of Oregon, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278 (1937); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); Staub v. City of Baxley, 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958).

To reiterate: as my opinion makes clear, the Supreme Court has declared the right to vote on an equal basis to be personal and protected, and the result which I here urge merely applies the guarantee of the Fourteenth Amendment to this right.

KENT, Chief Judge, with whom O'SULLIVAN, Circuit Judge, concurs.

■ The facts and issues in connection with this case are very, ably set forth in the opinion of Judge Fox. We find ourselves in a position where we concur with Judge Fox, writing for the Court, in reaching the conclusion that this Court will not overturn the acts of the de facto Kent Intermediate Board. We cannot concur in the conclusion wherein the statute creating such Intermediate Board of Education, M.S.A. 15.3294(1) et seq., is declared to be unconstitutional as in violation of the equal protection clause of the Fourteenth Amendment. Because of our holding this Court does not retain jurisdiction of the action.

The matter of malapportionment of boards and agencies of the states and their subsidiaries has not yet been before the United States Supreme Court. We recognize the impact of the cases to which reference is made in Judge Fox's opinion, but do not agree that the decisions to which reference is therein made require the District Courts of the United States to review the manner of apportionment and constitution of each and every board and agency of the several states, cities, villages, counties, parishes, townships, metropolitan districts, and all other such policy and decision making bodies which are in existence for the purpose of carrying out the intent of the legislatures which authorize their creation.

Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, is unquestionably authority for the "one man one vote" premise to be used in the apportionment of state legislatures. Citations of authority have been given in Judge Fox's opinion which he concludes would authorize the imposition of this same premise upon every agency of every body of government in existence in this country today. With this we are not in accord.

■ We prefer the result reached in Johnson v. Genesee County, Michigan, 232 F.Supp. 567, (E.D.Mich.1964), wherein Judge Stephen Roth states at page 572: "Under the prevailing view of the United States Supreme Court, as we have pointed out above, the composition of local units of government is held to be a state matter. Under the rule of stare decisis, this Court is not free to consider the subject of the apportionment of representation on local legislative bodies. It may well be that the time will come when the application of the Fourteenth Amendment will be extended that far. The more likely development is that the June 15, 1964, rulings of the Supreme Court in cases dealing with the state legislatures of Alabama, New York, Maryland, Delaware, Virginia, and Colorado will result in legislatures in our states which will be proportionately representative of people, and therefore, likely to themselves establish in local legislative bodies a vastly different balance between people and governmental power."

We recognize that the Supreme Court of the United States may at some time in the future reach the conclusion that the District Courts of the United States have the power and duty to prescribe guide lines for the selection of the many boards and commissions created and organized in connection with local government. We are satisfied that the Supreme Court of the United States has not yet reached that point. We are satisfied that we should not anticipate that the Supreme Court will reach that point.

For the reasons herein stated an order may be entered dismissing the complaint.