Gilbert M. CANTOR et al.

v.

SUPREME COURT OF PENNSYL-
VANIA, et al.

Civ. A. No. 72–1733.

United States District Court,
E. D. Pennsylvania.

Jan. 31, 1973.

Harry Lore, Gilbert M. Cantor, Philadelphia, Pa., for plaintiffs.

Wanda P. Chocallo, Philadelphia, Pa., for Albert Loel Katz, intervenor.

James D. Crawford, Philadelphia, Pa., for A. Evans Kephart.

Marvin Comisky, Philadelphia, Pa., for Pa. Bar Assn.

J. Shane Creamer, Atty. Gen., Burton D. Morris, Deputy Atty. Gen., for Pa. Supreme Court.

Lewis H. Van Dusen, Jr., Philadelphia, Pa., for American Bar Assn.

## OPINION

HIGGINBOTHAM, District Judge.

### I.

Most lawyers recall with pride the significant day when they took the oath to practice law with fidelity and integrity to their clients, the courts, and in the administration of the state and federal laws and constitutions. Sometimes on such occasions lawyers are reminded of goals such as those expressed so eloquently by Bacon in his extraordinary essay, On Judicature: "The place of justice is the hallowed place, and therefore not only the bench but the footpath and precincts and purpose thereof ought to be preserved without scandal and corruption."[1] Hopefully, most lawyers maintain that level of integrity required for the ideal administration of justice. Yet, some have failed to uphold those standards which they were sworn to keep, and then there arises the ancient question, "quis custodiet ipsos custodes" ["Who shall keep the keepers"].[2] In a real sense, the issue here is how should the legal profession keep its own house in order. In their attack on the Pennsylvania Supreme Court's Disciplinary Rules for lawyers, the plaintiffs do not argue that lawyers should be immune from discipline, but rather they attack the present procedure.

The plaintiffs' multi-faceted attack exemplifies our profession's capacity to proliferate legal labels and categorizations even when their cause is inadequate on substantive grounds. I am confident that they press their claims with sincerity, and they demonstrate creativeness in the breadth of their challenge. Yet, after careful review, I find that from the beginning to the end their arguments have no federal constitutional substance and therefore their complaint must be dismissed.[3]

1. Works of Lord Bacon, 59 (M. Murphy Ed. 1876).

2. Juvenal, The Satires, Book VI, Line 347.

3. The plaintiffs launch four categories of attack on the above rule: (1) Rule 17–19 violates the Fourteenth Amendment guarantees of Due Process and Equal Protection because the assessment of the $25 annual fee constitutes an exercise of legislative power by the judiciary; (2) the provision mandating summary suspension

## II

### Historical Perspective

As Justice Holmes has suggested, " . . . a page of history is worth a volume of logic."[4] The history which preceded the present rule must be first understood before delineating the purported constitutional issues.

In February of 1967, the American Bar Association created the Special Committee on Evaluation of Disciplinary Enforcement "to assemble and study information relevant to all aspects of professional discipline . . ."[5] The Committee was privileged to be chaired by the Honorable Tom C. Clark, Retired Associate Justice of the United States Supreme Court. Before the ABA Committee published its final report which said that the failure to have an adequate disciplinary system was a "scandalous situation that requires the immediate attention of the profession,"[6] the Board of Governance of the Pennsylvania Bar Association adopted a resolution on June 19, 1969 authorizing the appointment of a Committee to study the procedures in Pennsylvania relating to the discipline of lawyers and to submit recommenda-

tions for a more effective system.[7] Following the completion of both the Clark Report and the Pennsylvania Report, the Supreme Court of Pennsylvania on March 21, 1972 adopted and promulgated The Rules of Disciplinary Enforcement in Rule 17–19, §§ 1–25.[8] It is primarily Rule 17–19 which the instant plaintiffs challenge.

Robert W. Meserve, President of the American Bar Association recently commented:

"It is easy to exaggerate the dimensions of the problem as some sensation purveyors have done from time to time. Lawyers know that most of their colleagues do abide by the ethical code and that in relation to the one third of a million members of the profession only a very small number do not. But it is important that the public also know that we have the will and capacity to clean our house and weed out the transgressors.

Developments of late indicate that we are turning the corner in the direction of more effective disciplinary enforcement. For many years that burden has fallen largely upon practicing and uncompensated lawyers

for non-payment of the fee or for failure to file the required statement violates the Fourteenth Amendment due process guarantees; (3) the rule deprives clients of having qualified counsel of their choice and denies attorneys the right to counsel clients; and (4) the requirement that attorneys furnish information required by the Court Administrator violates a general right of privacy allegedly reflected in the First, Third, Fourth, Fifth, Ninth and Fourteenth Amendments to the United States Constitution.

The defendants, the Supreme Court of Pennsylvania, the seven Justices of the Pennsylvania Supreme Court, and the Court Administrator have filed a motion to dismiss for failure to state a claim upon which relief can be granted and for lack of subject matter jurisdiction in that there is no substantial federal question.

4. New York Trust Co. v. Eisner, 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921).

5. American Bar Association Special Committee on Evaluation of Disciplinary En-

forcement, Problems and Recommendations in Disciplinary Enforcement, Final Draft, June, 1970, p. xiii [hereinafter cited as Clark Report.]

6. Clark Report, p. 1.

7. Report of Special Committee on Disciplinary Procedures to the Members of the Board of Governance of the Pennsylvania Bar, January 26, 1971, p. 1.

8. Rule 17–19, *infra*, p. 1312. The most recent report on the implementation of the new Disciplinary System notes the appointment of " . . . 72 attorneys from all corners of the State to sit on Hearing Committees probing charges of unethical conduct against lawyers." A Chief Disciplinary Counsel, five Assistant Disciplinary Counsel, and three Investigators have been appointed. "The new system is financed entirely by attorneys themselves through an annual assessment of $25.00. The members of the Board and the Hearing Committee serve without compensation." Legal Intelligencer, January 31, 1973, at p. 1, col. 5. (Phila.)

serving on bar grievance committees, often without investigative help. But now a change in attitude, from apathy to action, is becoming apparent. The supreme courts and bar associations in several key states are moving to give the disciplinary system the muscle it needs to correct deficiencies brought to national attention in the Clark committee study published in 1970."[9]

Purporting to represent a class consisting of all attorneys in Pennsylvania and also various clients who have allegedly been deprived of chosen counsel by reason of the operation of the suspension provisions of the rules, on August 31, 1972, the plaintiffs filed suit seeking (1) the convening of a three-judge court pursuant to 28 U.S.C. § 2281[10] and § 2284;[11] (2) a declaration that the disciplinary rules are unconstitutional on their face and as applied (28 U.S.C. §§ 2201,[12] 2202[13]), and (3) an injunction restraining further enforcement of the rules (28 U.S.C. § 2283[14]). The plaintiffs allege causes of action under 42 U.S.C. § 1983, Article I, § 2 and Article II, § 4 of the United States Constitution, and the First, Third, Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution. The plaintiffs assert jurisdiction under 28 U.S.C. §§ 1331,[15] 1343.[16]

9. 59 A.B.A.J. 5 (1973).

10. 28 U.S.C. § 2281 provides:
"An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."

11. 28 U.S.C. § 2284 provides in relevant part:
"In any action or proceeding required by Act of Congress to be heard and determined by a district court of three judges the composition and procedure of the court, except as otherwise provided by law, shall be as follows:
(1) The district judge to whom the application for injunction or other relief is presented shall constitute one member of such court. On the filing of the application, he shall immediately notify the chief judge of the circuit, who shall designate two other judges, at least one of whom shall be a circuit judge. Such judges shall serve as members of the court to hear and determine the action or proceeding.
(2) If the action involves the enforcement, operation or execution of State statutes or State administrative orders, at least five days notice of the hearing shall be given to the governor and attorney general of the State."

12. 28 U.S.C. § 2201 states:
"In a case of actual controversy within its jurisdiction, except with respect to Federal taxes, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

13. 28 U.S.C. § 2202 provides:
"Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

14. 28 U.S.C. § 2283 provides:
"A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

15. 28 U.S.C. § 1331 provides:
"(a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises, under the Constitution, laws, or treaties of the United States.
(b) Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff is finally adjudged to be entitled to recover

In addition to the purely federal claims, *supra,* the plaintiffs assert that this Court should accept pendant jurisdiction over state law claims,—that the Disciplinary Rules exceed the rule making power of the Pennsylvania Supreme Court under Article V § 10(c) of the Pennsylvania Constitution, P.S., and violate the separation of powers mandated by Articles II, § 1; IV, § 1; and V, § 1 of the Pennsylvania Constitution.

The rule challenged by the plaintiffs is Rule 17–19 of the Rules of Disciplining Enforcement which now [16a] provides as follows:

*"Periodic Assessment of Attorneys*

(a) Every attorney admitted to practice in any court of this Commonwealth shall pay an annual fee of $25.-00. The annual fee shall be collected under the supervision of the Court Administrator of Pennsylvania, hereinafter referred to as "Court Administrator", who shall send and receive, or cause to be sent and received the notices and statements provided for hereafter. The said fee shall be used to defray the costs of disciplinary administration and enforcement under these Rules, and for such other purposes as the Board shall, with the approval of this Court, from time to time determine.

(b) Judges shall be exempt for such time as they serve in office.

(c) Any attorney who fails to timely pay the fee required under (a) above shall be summarily suspended, provided a notice of delinquency has been forwarded to him by certified mail, *return receipt requested,* addressed to his last known address at least 30 days prior to such suspension, unless he shall have been excused on grounds of financial hardship pursuant to procedures to be established by the Board.

(d) Any attorney suspended under the provisions of (c) above shall be reinstated without further order upon payment of all arrears due from the date of his last payment to the date of his request for reinstatement.

(e) To facilitate the collection of the annual fee provided for in (a) above, all persons required by this Rule to pay an annual fee shall, on or before July 1 of every year, commencing July 1, 1972, file a statement, on a form prescribed by the Court Administrator, setting forth his date of admission to the Supreme Court or, if not admitted in this Court, the dates of admission and courts to which he is admitted, his current residence and office addresses and such other infor-

---

less than the sum or value of $10,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interests and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff."

16. 28 U.S.C. § 1343 provides:
"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
(1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in Section 1985 of Title 42;
(2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in Section 1985

of Title 42 which he had knowledge were about to occur and power to prevent;
(3) To redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States:
(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

16a. The italicized portions of 17–19(c) and (g) are amendments which were enacted by the Pennsylvania Supreme Court on January 18, 1973, thus subsequent to the date when the complaint was filed herein.

mation as the Court Administrator may from time to time direct.

In addition to such statement, every attorney shall file a supplemental statement of any change in the information previously submitted within 30 days of such change. All persons first becoming subject to these Rules by admission after July 1, 1972 shall file the statement required by this Rule at the time of admission, but no annual fee shall be payable until the 1st day of July next following such admission.

(f) Within 20 days of the receipt of a statement or supplement thereto filed by an attorney in accordance with the provisions of (e) above, receipt thereof shall be acknowledged, on a form prescribed by the Court Administrator, in order to enable the attorney on request to demonstrate compliance with the requirement of (a) and (e) above. The certificate issued shall distinguish between attorneys admitted to this Court and attorneys not admitted to this Court but admitted to another court of this Commonwealth.

(g) Any attorney who fails to file the statement or supplement thereto in accordance with the requirements of (e) above shall be summarily suspended, *provided a notice of delinquency has been forwarded to him by certified mail, return receipt requested, addressed to his last known business address at least 30 days prior to such suspension,* until he shall have complied therewith, whereupon he shall be reinstated without further order.

(h) An attorney who has retired or is not engaged in practice shall file a notice in writing that he desires to assume inactive status and discontinue the practice of law. Upon the filing of such notice, the attorney shall no longer be eligible to practice law but shall continue to file the statement required by this Rule for six years thereafter in order that he can be located in the event complaints are made about his conduct while he was engaged in practice. The attorney, however, will be relieved from the payment of the fee imposed by this Rule upon active practitioners.

(i) Upon the filing of a notice to assume inactive status, an attorney shall be removed from the roll of those classified as active until and unless he requests and is granted reinstatement to the active rolls. Reinstatement shall be granted, unless the attorney is subject to an outstanding order of suspension or disbarment, upon the payment of any assessment in effect for the year the request is made and any arrears accumulated prior to transfer to inactive status."

### III

### Standards for Convening a Three-Judge Court

The threshold question before me is whether the plaintiffs' federal constitutional challenge to the disciplinary rules of the Pennsylvania Supreme Court requires the convening of a three-judge court pursuant to 28 U.S.C. §§ 2281 and 2284. Initially, there is no question that the disciplinary rules in question are a "statute" of state-wide application thus bringing this case within the ambit of § 2281.[17] Accordingly I must decide whether the challenge to the rules in question presents a substantial federal question mandating my convening a three-judge court or whether the federal constitutional issues are insubstantial, thus requiring dismissal of the complaint.[18]

---

17. *See,* Board of Regents of University of Texas System v. New Left Education Project, 404 U.S. 541, 92 S.Ct. 652, 30 L.Ed.2d 697 (1972).

18. Goosby v. Osser, —— U.S. ——, 93 S.Ct. 854, 35 L.Ed.2d 36; Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962); Ex Parte Poresky, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152 (1933); Mammon v. Schatzman, 472 F.2d 114 (3rd Cir. 1972); Keiser v. Bell, 332 F.Supp. 608 (E.D.Pa.1971).

In Ex parte Poresky, 290 U.S. 30, 31, 54 S.Ct. 3, 4, 78 L.Ed. 152 the Supreme Court said that "[a] substantial claim of unconstitutionality" is necessary for the convening of a three judge court, and that the statute "does not require three judges to pass upon this initial question of jurisdiction." The Court further said:

"The existence of a substantial question of constitutionality must be determined by the allegations of the bill of complaint. Mosher v. [City of] Phoenix, 287 U.S. 29, 30, 53 S.Ct. 67, 77 L.Ed. 148; Levering & Garriques Co. v. Morrin, 289 U.S. 103, 105, 53 S.Ct. 549, 550, 77 L.Ed. 1062. The question may be plainly unsubstantial either because it is 'obviously without merit' or because 'its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the question sought to be raised can be the subject of controversy.' Levering & Garrigues Co. v. Morrin, supra; Hannis Distilling Co. v. Baltimore, 216 U.S. 285, 288, 30 S. Ct. 326, 54 L.Ed. 482; McGilvra v. Ross, 215 U.S. 70, 80, 30 S.Ct. 27, 54 L.Ed. 95.

"While it is appropriate that a single District Judge to whom application is made for an interlocutory injunction restraining the enforcement of a state statute should carefully scrutinize the bill of complaint to ascertain whether a substantial question is presented, to the end that the complainant should not be denied opportunity to be heard in the prescribed manner upon a question that is fairly open to debate, the District Judge clearly has authority to dismiss for the want of jurisdiction when the question lacks the necessary substance and no other ground of jurisdiction appears." 290 U.S. at 32, 54 S.Ct. at 4–5."

█ While certainly no plaintiff entitled to a three-judge court should be de-nied one, it is clear that such courts constitute a "serious drain upon the federal judicial system" and thus the district judge should carefully scrutinize the complaint to ascertain whether the plaintiff has met the prerequisite standard required for the convening of a three-judge court. See, Jones v. Branigin, 433 F.2d 576, 577 (6th Cir. 1970); Note, The Three-Judge District Court and Appellate Review, 49 Va.L.Rev. 538 (1963).[19]

## IV

## The Applicability of Lathrop v. Donohue

Initially, I was inclined to limit this opinion to merely a one-paragraph memorandum citing Lathrop v. Donohue, 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961); for in every material aspect, *Lathrop* seems to be totally controlling of the instant case. However, because of the importance of the disciplinary system to the Bar and to the public, I feel that I owe the parties the obligation to discuss all of the issues raised by plaintiffs even though many allegations seem esoteric and more remote than relevant.

In many ways, *Lathrop, supra,* is a classic *a fortiori* case in that if compulsory enrollment and payment of dues to the State Bar of Wisconsin was not a violation of federal constitutional rights, certainly the requirement that lawyers pay to the court a fee for their own disciplinary system should not breach any constitutional right.

*Lathrop* involved the compulsory ("integrated") bar association requirement. For in Wisconsin, every lawyer had to pay dues to the State Bar Association of Wisconsin, and the State Bar Association of Wisconsin was there involved in activities far more pervasive than the mere disciplinary functions of the instant case. The Wisconsin Bar Association's activities included promoting purported law reform, advocacy before legislative bodies, committees, lawyers and taking their "political", legal reform pro-

19. Keiser v. Bell, 332 F.Supp. 608 (E.D.Pa.1971).

grams "to the people" for the latter's endorsement. Attorney Lathrop objected to funding such political activities as conducted under the banner of the Wisconsin Bar Association. As he asserted: "I do not like to be coerced to support an organization which is authorized and directed to engage in political and propaganda activities . . . " where the Bar uses "its employees, property and funds in active, unsolicited opposition to the adoption of legislation by the Legislature of the State of Wisconsin, which was favored by the plaintiff, all contrary to plaintiff's convictions and beliefs". In contrast to *Lathrop,* the defendants have conceded here that the $25 annual fee will be used solely for purposes pertaining to the creation and maintenance of a lawyers' disciplinary system. In *Lathrop,* a plurality of the Supreme Court held:

> "We think that the Supreme Court of Wisconsin, in order to further the State's legitimate interests in raising the quality of professional service, may constitutionally require that the costs of improving the profession in this fashion should be shared by the subjects and beneficiaries of the regulatory program . . . " 367 U.S. at 843, 81 S.Ct. at 1838.

In addition, two concurring Justices, Harlan and Frankfurter, reaching the First Amendment claims, held that not only could the Wisconsin State Supreme Court require the payment of dues, but could also force membership in the State Bar Association which used the dues for political purposes. 367 U.S. at 848, 81 S.Ct. at 1840. Justice Whittaker concurred on the ground that a state may require a lawyer to pay the $15 annual dues to continue in the "special privilege" of practicing law. 367 U.S. at 865, 81 S.Ct. 1849.

Dissenting on the ground that compulsory bar membership violated the First Amendment, Justice Black nevertheless, would have apparently upheld the mandatory annual fee if not coupled with required membership. 367 U.S. at 877,

81 S.Ct. at 1855. Though, in his dissent, Justice Douglas held that the "integrated" bar scheme violated the First Amendment guarantees, it appears that he too would have upheld a compulsory fee for disciplinary purposes. 367 U.S. at 881, 81 S.Ct. at 1858.

Thus as to those issues which are germane to the instant case, *Lathrop* could be construed as a case where the Supreme Court would have been unanimous on the instant issue—that for the restrictive uses here, the compulsory annual fee to even a State Bar Association would not have breached federal constitutional rights.

### V.

The Pennsylvania Supreme Court's Purported Usurpation of Legislative Power as an Article IV, § 4 (Guaranty Clause) Issue

The plaintiffs claim that the Pennsylvania Supreme Court's imposition of the annual fee constitutes a usurpation of legislative power by the judiciary thus denying to attorneys the "republican form of government" mandated by Article IV, § 4 of the United States Constitution. As Chief Judge Seitz recently wrote for the majority in a statutory three-judge court decision in Kaelin v. Warden, 334 F.Supp. 602, 606 (E.D.Pa.1971):

> "We are unable to consider plaintiffs' claim under the Guaranty Clause for it has long been established that this clause is not enforceable through the courts in this context since it does not provide manageable judicial standards and presents questions which are political in nature. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); Mountain Timber Co. v. Washington, 243 U.S. 219, 37 S.Ct. 260, 61 L.Ed. 685 (1917); Luther v. Borden, 48 U.S. (7 How.) 1, 12 L.Ed. 581 (1849). The nonjusticiability of the claim resting upon the Guaranty Clause, however, does not prevent us

from considering plaintiffs' claims under the Fourteenth Amendment." [20] Accordingly, I cannot veto on Article IV, § 4 grounds the decision of the people of Pennsylvania to vest general judicial power in the Pennsylvania Supreme Court; for in the Pennsylvania Constitution Article V, § 10(c), the Pennsylvania Supreme Court is given the power to prescribe general rules "for admission to the bar and to practice law. . ." [21]

There is a particular irony in plaintiff's assertion that their rights to a "republican form of government" have been breached. For the process under the Pennsylvania Constitution is pro-republican rather than anti-republican. A substantial majority of the voters of the state approved the constitutional provision and placed the regulatory power—not in a non-elective body—but in an elective body, the Pennsylvania Supreme Court. Thus, the voters made a deliberate judgment to place the power with that elected body (the Pennsylvania Supreme Court) which presumably had the highest expertise on the regulation of lawyers.

### VI.

Does the Disciplinary Rule Violate the Pennsylvania Constitution's Separation of Power Scheme, and if so, Would That Violation Constitute Breach of a Federal Constitutional Right?

In substance, plaintiffs argue that under the Pennsylvania Constitution, the Pennsylvania Supreme Court does not have authority to mandate payment of any annual fee by lawyers even when those funds are to be used for maintenance of a disciplinary program. They concede that if the state legislature had imposed the $25 annual fee on lawyers that such exaction would be permissible under the Pennsylvania Constitution's separation of powers. [22] In reality, they are asserting that because the Pennsylvania Supreme Court (the highest Pennsylvania judicial institution with expertise in the legal field) is mandating the fee instead of the Pennsylvania Legislature (a conglomerate of persons with no institutional expertise in this field) lawyers' federal constitutional rights have been violated.

■■ At the outset it must be noted that this assertion raises in part pendant jurisdiction problems which are discussed in footnote 36, *infra*. I find that plaintiffs' analysis of state law is in error and that under the Pennsylvania Constitution the Supreme Court's fee requirement is permissible.[23] Yet, even if the state constitution required the State Legislature rather than the Pennsylvania Supreme Court to assess the annual fee, still the state separation of powers problem would not be a justiciable issue for federal courts. Instead, in its present context the state separation of powers problem is a political nonjusticiable issue.

It is unnecessary here to revive the learning or to compound the confusion which has proliferated in such detail since Colegrove v. Green [24] and Baker v. Carr.[25] It is enough to observe that some issues are ". . . so enmeshed

---

20. Though Judge Kraft dissented on other grounds, he apparently did not disagree with the majority's holding on the Article IV, § 4 issue.

21. I construe this provision to cover not merely the original admission to practice law, but to embrace the continuous monitoring of the practice of law.

22. "The Supreme Court of Pennsylvania has imposed annual charge of $25 on lawyers. Such an imposition is fundamentally a legislative act." Brief for Plaintiffs, p. 9.

23. By the very proclamation of the disciplinary rules, the Supreme Court of Pennsylvania, which may be the appropriate forum for such decisions, has by implication decided that the rules are a valid exercise of its State Constitutional power under Article V, § 10(c).

24. 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946).

25. 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

with those political question elements . . ." that they become nonjusticiable ". . . as actually to present a political question itself." [26] Other issues are not so enmeshed to become political questions. Thus the Supreme Court in Baker v. Carr found the "one man-one vote" issue was not so enmeshed with the political question elements that the Court was precluded from adjudicating the 14th Amendment Equal Protection rights. The instant case is not like Baker v. Carr. Rather, it is more concencentric with Pacific States Telephone and Telegraph Co. v. Oregon.[27] In *Pacific States,* plaintiffs claimed that Oregon's imposition of a tax on corporations enacted through the initiative procedure was unconstitutional apparently under (1) the Due Process Clause, (2) the Equal Protection clause, and (3) the Guaranty Clause. The Court noted that because the plaintiff there was in essence asserting that any tax enacted by the initiative process would violate the Fourteenth Amendment, the Corporation's claims were grounded on the theory that the Oregon initiative procedure itself violated the Guaranty Clause. In dismissing the complaint for want of jurisdiction and because it was a legislative function to determine the political question of whether a state has a "republican form of government", the Court stated the following:

"The defendant company does not contend here that it could not have been required to pay a license tax. It does not assert that it was denied an opportunity to be heard as to the amount for which it was taxed, or that there was anything inhering in the tax or involved intrinsically in the law which violated any of its constitutional rights. If such questions had been raised, they would have been justiciable, and therefore would have required the calling into operation of judicial power. Instead, however, of doing any of these things, the attack

on the statute here made is of a wholly different character. Its essentially political nature is at once made manifest by understanding that the assault which the contention here advanced makes it [sic] not on the tax as a tax, but on the state as a state. It is addressed to the framework and political character of the government by which the statute levying the tax was passed. It is the government, the political entity which (reducing the case to its essence) is called to the bar of this court, not for the purpose of testing judicially some exercise of power assailed on the ground that its exertion has injuriously affected the rights of an individual because of repugnancy to some constitutional limitation, but to demand of the state that it establish its right to exist as a State, republican in form." Pacific States Tel. & Tel., 223 U.S. at 150–151, 32 S.Ct. at 231."

■ By way of explanation of the *Pacific States* reasoning, the Supreme Court in Baker v. Carr quoted the above from *Pacific States* and continued:

"The due process and equal protection claims were held nonjusticiable in Pacific States not because they happened to be joined with a Guaranty Clause claim, or because they sought to place before the Court a subject matter which might conceivably have been dealt with through the Guaranty Clause, but because the Court believed that they were invoked *merely in verbal aid of the resolution of issues which, in its view, entailed political questions.*" Baker v. Carr, 369 U.S. at 228, 82 S.Ct. at 716 (emphasis supplied).

To the extent that plaintiffs' argument is bottomed on an allegation that federal constitutional rights are breached because the Disciplinary Rules purportedly violate the Pennsylvania Constitution's separation of power scheme, I find that

---

26. Baker v. Carr, supra, 369 U.S. at 227, 82 S.Ct. at 715.

27. 223 U.S. 118, 32 S.Ct. 224, 56 L.Ed. 377 (1912).

the federal constitutional claims are both insubstantial and nonjusticiable.

## VII.

### Suspension Provisions

The third prong of plaintiffs' attack on the Disciplinary Rules is directed at the provisions that (1) an attorney shall be summarily suspended for failure to pay the $25.00 fee after thirty (30) days notice of the delinquency has been forwarded by certified mail, return receipt requested, to his or her last known business address (Rule 17–19(c), and (2) an attorney shall be summarily suspended after thirty (30) days notice of the delinquency has been forwarded by certified mail, return receipt requested, to his or her last known business address for failure to file the required statement. (Rule 17–19(g).)

Part of the thrust of plaintiffs' challenge to the disciplinary rules may now be partially moot by reason of the Pennsylvania Supreme Court's amendment to the rules effective January 18, 1973. (See footnote 16a, *supra*.) Under original rule 17–19(g) there was some question whether or not notice of delinquency had to be forwarded to the attorney's last known business address thirty days before the effective date of the suspension, by certified mail. In their original brief, the defendants asserted that the 30-day notice requirement was implicitly included in the suspension for failure to file the statement and that the rules would be amended to make the notice requirement explicit. Thus, in my discussion of suspension for failure to file the required statement, I have considered Rule 17–19(g), as amended, which requires notice by certified mail, return receipt requested, 30 days prior to any suspension.

 The question here is whether those suspension provisions violate the Fourteenth Amendment guaranty of Due Process of Law. I hold that suspension with notice but without a hearing either for failure to pay the $25.00 disciplinary fee or for failure to file the required statements does not violate due process of law.

 As I have found above, the imposition of the $25.00 fee raises no substantial federal question. Further, the required statement likewise does not raise a substantial question either as a violation of the constitutional right to privacy or on grounds of vagueness or overbreadth. Viewing these two findings of insubstantiality as a background to this discussion, the Due Process question is what would be the value of a hearing held prior to a summary suspension for failure to pay the $25.00 fee or to file the required statement. It is clear from such decisions as Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L. Ed.2d 556 (1972) (hearing imposed before goods could be replevied), Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (hearing required before driver's license suspended where question of liability affected result), and Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (hearing required before welfare benefits terminated) that a hearing must serve a meaningful purpose in order for it to be mandatory under the Fourteenth Amendment. For example, in Goldberg v. Kelly, supra, 397 U.S. at 269, 90 S.Ct. at 1021, the Supreme Court observed:

> "In almost every setting where important discussions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witness."

 In the instant case there are no important questions of fact; for the question as to whether or not the fee has been paid is easily established by a cancelled check or other receipt and the question as to whether or not the statement has been filed is simply determined by presenting a copy, or because of its short length, preparing a duplicate questionnaire if the issue of non-receipt of the original is raised. Thus, here where the Rules do provide for thirty days' notice by certified mail, return receipt requested, before summary suspen-

sion and *automatic reinstatement upon payment of the fee or filing of the statement* (Rules 17–19(d) and (g)), the state has satisfied the requirements of due process of the Fourteenth Amendment. In conclusion, where there are no facts to be determined which particularly necessitate a hearing being held before the automatic suspension provision is activated, no hearing is required by the recent Supreme Court decisions and accordingly no substantial question is presented requiring a three-judge court.

■ One final argument of the plaintiffs in this phase of their assault must be noted. The attorney-plaintiffs assert that the penalty of *temporary suspension* for failure to pay the $25.00 fee or for failure to file the statement is a punishment out of proportion to the "offense" and therefore violative of due process. Accordingly, I hold that the magnitude of the punishment herein is sufficiently reasonable that it raises no substantial federal question requiring a three-judge court.

## VIII.

Alleged Deprivation of Right of Counsel

Another point in the barrage of arguments made in an effort to invalidate the State's Disciplinary Rules, the plaintiffs assert that the Rules deprive clients of their right to qualified counsel of their choice and deny attorneys the right to counsel those clients. I hold, for the reasons appearing below, that despite the creativity of these allegations, there is not here presented any substantial federal question requiring my convening a three-judge court.

■ The argument here focuses on the freedom of a client to counsel of his choice. While it is clear that the cases cited by the plaintiffs, e. g., N.A.A.C.P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), do establish a right to counsel of one's choice, there must be an implied reservation that counsel must be read to be an attorney in good standing and licensed to practice in some

state. Here, once an attorney has been summarily suspended as described in Part VII, *supra*, he no longer has the right to represent anyone. Further, the Rules do not infringe in any way on the inviolability of the attorney-client relationship; rather, they merely force an attorney to comply with the reasonable requirements of the Pennsylvania Supreme Court in order to continue in the active practice of law. Accordingly, even though the constitutional right to privacy blankets the attorney-client relationship, the summary suspension provisions do not unreasonably impinge on that right thereby depriving a client of his choice of counsel. Thus, there is no substantial federal question requiring a three-judge court raised by the deprivation of counsel claims.

## IX.

General Powers of the Court
Administrator

■ Another phase of plaintiffs' attack on the Pennsylvania Disciplinary Rules is an allegation of unconstitutionality of the power in the Court Administrator to require the filing of an annual statement by all attorneys "setting forth his date of admission to the Supreme Court or . . . the dates of admission and [other] courts to which he is admitted, his current residence and office address and such other information as the Court Administrator may from time to time direct." (Rule 17–19(e).) More specifically, plaintiffs assert that the vesting of power in the Court Administrator to obtain such information as he may "*direct*" constitutes an impermissibly vague and overbroad enactment in violation of the Fourteenth Amendment.

### A. *Vagueness*

Plaintiffs' attempted reliance on the vagueness doctrine is clearly inapposite. Last term, the United States Supreme Court in Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 2298–2299, 33 L.Ed.2d 222 (1972) discussed the rea-

sons for the offensiveness of vague statutes:

"First, because we assume that a man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. *A vague law impermissibly delegates basic policy matters to policemen, judges, and juries* for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms', it 'operates to inhibit the exercise of [those] freedoms.'" (Emphasis added) (footnotes omitted)

■■■ A close reading of the Supreme Court's observations in *Grayned* indicates that they apply primarily to criminal situations where the problem of a vague statute is the determination of what the state's criminal statute "commands or forbids." [28]

One need not be learned in the law to understand this precise, rather simplistic rule. The attorneys must pay the $25.00 annual fee and file a statement precisely as required by the Court Administrator including the attorney's Social Security Number. There is no question here raised that any of the questions thus far posed by the Court Administrator are so broad that one must speculate as to what answer is intended. Additionally, even if such a vague question were posed in the future and an attorney subjected to summary suspension under Rule 17–19(g) for failure to file the required statement, the attorney will always have accessibility to the Courts to challenge the allegedly vague questions.[29] Moreover, a court may not speculate as to what questions the Court Administrator may develop in the future which might be too vague. Accordingly, the Rule here questioned presents no substantial federal question on vagueness grounds.

### B. *Overbreadth*

Plaintiffs' overbreadth [30] argument focuses on the apparent ability of the Court Administrator to use the funds collected "for such other purposes as the Board shall, with the approval of the Court, from time to time determine. . . ." (Rule 17–19(a). Counsel for the defendants have conceded and stated on the Record of the October 25, 1972 hearing in this case that the funds collected will only be used for disciplinary purposes. Thus, by this express limitation on the use of the funds collected under the system, any potential overbreadth problem which might have risen to the level of presenting a substantial federal question has been obviated.

Furthermore, in this phase, the plaintiffs also allege that the phrase "such other information as the Court Administrator may from time to time direct" in Rule 17–19(e) is overbroad as vesting power to ask questions which may impinge on other constitutional guarantees. As noted in the "vagueness" section, the Courts are always available to consider whether the posing of any specific question violates any provision of the Constitution.[31]

---

28. Papachristou v. City of Jacksonville, 405 U.S. 156, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972).

29. *Cf.*, Walker v. City of Birmingham, 388 U.S. 307, 319, 87 S.Ct. 1824, 1831, 18 L.Ed.2d 1210 (1967).

30. See, Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972).

31. *Accord*, Law Students Civil Rights Research Council v. Wadmond, 299 F.Supp. 117 (S.D.N.Y.1969), aff'd. 401 U.S. 154, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971).

## X

### Does Requiring a Lawyer's Social Security Number Breach His Constitutional Right to Privacy?

On the surface, the Administrator's request that each lawyer provide his Social Security Number seems a rather innocuous request during this day of zip codes, area codes, Blue Cross numbers and automation.

In a case challenging Virginia Drivers' License requirements, Judge Mehrige sustained over privacy challenges a Virginia statute which required that all residents must furnish their Social Security numbers as a condition of receiving or renewing their Virginia drivers' licenses. Conant v. Hill, 326 F.Supp. 25 (E.D.Va.1971).[32]

In several related cases, courts have upheld over constitutional right of privacy challenges mandatory fingerprinting requirements for employees of stock exchange firms in Thom v. New York Stock Exchange, 306 F.Supp. 1002, (S. D.N.Y.1969), aff'd. sub nom, Miller v. New York Stock Exchange, 425 F.2d 1074 (2nd Cir. 1970), cert. denied, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970). The Second Circuit has also upheld mandatory fingerprinting of all mental patients in Winters v. Miller, 446 F.2d 65 (2d Cir. 1971).

In Thom v. New York Stock Exchange, *supra*, 306 F.Supp. at 1006, Judge Weinfeld in commenting on the fingerprint requirements there stated:

> "[I]t appears reasonably calculated to meet the evils toward which it was directed without imposing any undue burden upon individuals, and consequently represents a valid exercise of the state's police power." (footnote omitted)

Similarly, in the instant case, the Court Administrator justifies the need for Social Security numbers for use in "the internal computer system of the Disciplinary Board, and to facilitate users checks with the disciplinary boards of sister states and with the information received system of the American Bar Association." (Brief for Defendants, p. 18).

Additionally, a further justification for the use of Social Security numbers is to avoid errors in the identification of attorneys. In the 1972 Edition of the *Philadelphia Legal Directory*, a publication which includes not even all the practicing attorneys in Philadelphia, I may take judicial notice of the fact that listed there are, for example, thirty-nine "Cohens", eleven "Coopers", fifteen "Davis'", ten "Kellys", fourteen "Segals", and thirty-seven "Smiths". Moreover, among the "Segals", there are two "Bernard Segals", among the "Colemans", there are two "William Colemans" and among the "Ryans", there are two "Joseph Ryans". The right of privacy must, in this context, be weighed against the desirability of accurate information so that innocent persons will not suffer from erroneous information. It is clear that use of some identifying number to avoid clerical errors is essential for the type of system which minimizes errors of identification.

Despite the formidable precedents, plaintiffs consider the request for a lawyer's Social Security number as an affront to the "early antecedents in Western civilization." In their brief, after extensively reviewing Locke, Rousseau, Bentham, and Mills, they assert:

> "Of all the rights and liberties which are fundamental in a democracy, and which in turn are guaranteed by democratic governments, the right of privacy is perhaps the most "natural" and in the most ultimate sense (that is, in terms of survival) pragmatic. For it is linked intimately with the tight-rope walk of biological destiny that we call evolution". (Brief for Plaintiff, p. 17)

I am not unmindful of the right of privacy as generally guaranteed

---

32. This decision is not reported but is discussed as to the privacy phase in Conant v. Hill, 326 F.Supp. 25, 26–27 (E.D.Va. 1971).

in the boudoir,[33] on the telephone,[34] for the private possession of obscene films,[35] or for ". . . a woman's decision whether or not to terminate her pregnancy."[35a] Yet it is impossible for me to perceive how requiring a Social Security number either threatens the future of Western civilization or deprives lawyers of basic individual dignity, and certainly it does not rise to a breach of any federal constitutional rights.[36]

A lawyer has no sacred right to keep inviolate the privacy of his Social Security number. He shares the burdens of an organized society. He has no more exalted standing than the applicant for a Virginia driver's license who must give his Social Security number.[37] His privacy is no more sacred than that which is lost by the employee of the stock exchange[38] or a New York mental patient who must give fingerprints.[39]

If the clock of history could be turned back to Thoreau's *Walden*, greater privacy might be found; but the retreat into yesterday is not now possible. Thus, "doctors, lawyers, and Indian Chiefs" must share with others the burdens of organized society. Bluntly, in this case, the right of privacy does not encompass the Social Security number.

Perhaps as Edmund Burke has reminded us, "The law sharpens the mind by narrowing it".

## ORDER

And now, this 31st day of January, 1973, the following is hereby ordered with reference to the above-captioned civil action:

1. The Motion to Intervene of Albert Loeb Katz is granted.

2. The Motion to Dismiss the Complaint of Albert Loeb Katz, intervenor, for failure to raise a substantial federal claim is granted.

3. The Motion to Dismiss the Complaint of Gilbert Cantor, et al, for failure to raise a substantial federal question is granted.

4. The American Bar Association is granted leave to appear as *amicus curiae*, and its able brief was considered.

33. Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

34. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

35. Stanley v. Georgia, 394 U.S. 557, 89 S. Ct. 1243, 22 L.Ed.2d 542 (1969).

35a. Roe v. Wade, —— U.S. ——, 93 S.Ct. 705, 35 L.Ed.2d 147. *Cf.*, Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972).

36. Given the insubstantiality of every federal claim presented here, a federal court lacks the jurisdictional power to consider the state law claims. In United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966), the Supreme Court noted: "Pendant jurisdiction, in the sense of judicial *power*, exists whenever there is a claim 'arising under the Constitution, the Laws of the United States, and treaties made, . . . and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional case.' *The federal claim must have substance sufficient to confer subject matter jurisdiction on the court."* (emphasis added) Further, in Rosado v. Wyman, 397 U.S. 397, 404, 90 S.Ct. 1207, 1213–1214, 25 L.Ed.2d 442 (1970), the Supreme Court held that an unsubstantial federal claim is insufficient to confer jursidiction on the federal court to consider the state law claims. *See*, Mishkin, The Federal "Question" in the District Courts, 53 Colum.L.Rev. 157, 166–68 (1953).

37. Conant v. Hill, *supra*.

38. Thom v. New York Stock Exchange, *supra*.

39. Winters v. Miller, *supra*.